**Walter W. CRUTTENDEN and Fay T. Cruttenden, Petitioners-Appellees,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellant.**

No. 79–7066.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 7, 1980.

Decided May 15, 1981.

R. Russell Mather, Washington, D.C., argued for respondent-appellant; Gilbert E. Andrews, Chief, Washington, D.C., on brief.

Lewis M. Porter, Jr., Boodell, Sears, Sugrue, Giambalvo & Crowley, Chicago, Ill., for petitioners-appellees.

Before NELSON and CANBY, Circuit Judges, and LARSON,* District Judge.

NELSON, Circuit Judge:

In this appeal we confront the ambivalent tax characteristics of a practice in the stock brokerage industry: the borrowing of securities by a brokerage firm under a subordination agreement that allows the firm to use the securities to meet its net capital requirements under stock exchange rules. While it is clear that legal title to the securities does not pass from the lender to the brokerage firm by terms of the agreement under review, we must determine whether the agreement so impairs the lender's title as to bring the lender's expenses in terminating the agreement within the scope of the rules that costs of defending or perfecting title to property, or recovering property, must be capitalized rather than deducted from ordinary income.

Taxpayer,[1] the lender under a subordination agreement of this type, deducted legal expenses incurred in terminating that agreement and obtaining the return of loaned securities. The Commissioner disallowed the deduction and determined a deficiency in taxpayer's 1971 income tax payment. On taxpayer's petition for review, the Tax Court ruled that the disputed expenses were deductible, under section 212(2)

of the Internal Revenue Code, as ordinary and necessary expenses for the management, conservation, or maintenance of property held for the production of income.[2] The Commissioner has appealed, arguing that the disputed expenses are capital and cannot be deducted from current income. For the reasons given below, we affirm the decision of the Tax Court, although we do not adopt the whole of its analysis.

## FACTS

The facts in this case, including those relevant to several issues not before us in this appeal, have been reported in detail in the Tax Court's published decision. We shall confine ourselves to a discussion of the circumstances under which the subordination agreements at issue here were created and terminated.

The taxpayer owned a minority interest in a closely held stock brokerage firm ultimately known as Command Securities, Inc. ("Command"), operated and primarily owned by her two sons. In 1964, to aid the firm in meeting the net capital requirements of the stock exchange to which it belonged, taxpayer executed a subordinated loan agreement under which a quantity of her securities were placed at the disposal of the firm. Taxpayer lent additional securities in 1969 under similar subordination terms in connection with an expansion of the brokerage firm. The subordination agreements allowed the borrowing firm to use the securities in its business and to pledge them as collateral to secure loans. The taxpayer's claim to return of the securities was expressly subordinated to the claims of all present and future creditors of Command.

In late 1969 and early 1970, a deal was concluded whereby an outside investor, Systems Capital Corp. ("Systems"), would acquire the outstanding shares of Command

---

* Hon. Earl R. Larson, Senior United States District Judge, District of Minnesota, sitting by designation.

1. "Taxpayer" in this opinion refers only to appellee Fay T. Cruttenden. Her husband, Walter

Cruttenden, Sr., is a party to this proceeding only because he and Fay filed a joint income tax return in 1971.

2. The opinion, reviewed by the entire Tax Court, can be found at 70 T.C. 191 (1978).

in a stock-for-stock exchange. Under a contemporaneous agreement, Systems obligated itself to return to taxpayer the various subordinated securities within six months of the date the Command acquisition was approved by the stock exchange. The agreements were signed on January 30, 1970, and exchange approval came on April 15, 1970, so that the subordinated securities were due to be returned by October 15, 1970.

Systems failed to return the securities when due, and sought an extension of the due date. After a series of negotiations, the parties hammered out a new agreement in February, 1971, under which one group of securities would be returned no later than March 10, 1971, with the remainder due no later than June 30, 1971. The new agreement, which was coupled with a new subordination agreement, contained terms which, according to taxpayer's counsel, would form the basis for a successful summary judgment should Systems again fail to perform. Systems did *not* fail, however, and taxpayer received her securities in 1971 as agreed.

In obtaining the return of these securities, taxpayer incurred $16,095.13 in fees from the law firm that represented her both in the initial agreement to return the securities and in the subsequent negotiations and new agreement to return them. The deductibility of that amount on taxpayer's 1971 tax return is the subject of this appeal.

## DISCUSSION

Section 212(2) of the Internal Revenue Code provides that an individual may deduct "all the ordinary and necessary expenses paid or incurred during the taxable year ... for the management, conservation, or maintenance of property held for the production of income." [3] Section 263(a) of the Code prohibits deduction of capital expenditures.[4] These two statutory provisions form the framework of our inquiry.

The Commissioner challenges the Tax Court's determination that the disputed expenses are deductible on two grounds: first, that the expenses must be capitalized because they relate to defense or perfection of title to property; and second, that they must be capitalized because, under the applicable regulation, they relate to "recovery" of property. The two points are related but we shall address them individually.[5]

## I. DEFENSE OR PERFECTION OF TITLE

 It is axiomatic in tax law that expenses incurred in the defense or perfection of title to property cannot be deducted from ordinary income as current expenses,

3. "In the case of an individual, there shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year—
 (1) for the production or collection of income;
 (2) for the management, conservation, or maintenance of property held for the production of income; or
 (3) in connection with the determination, collection, or refund of any tax."
 I.R.C. § 212.

4. "(a) *General Rule.*—No deduction shall be allowed for—
 (1) Any amount paid out for new buildings or for permanent improvements or betterments made to increase the value of any property or estate...."
 I.R.C. § 263(a).

5. One potentially difficult issue is not before us here. The Tax Court rejected the argument that the expenses at issue here related to the cost of the stock-for-stock acquisition of Command by Systems, and found that taxpayer's status as a creditor of Command was independent of her status as a shareholder. 70 T.C. at 200. The Tax Court thus implicitly found that the origin and essential nature of the claim here was not in the acquisition or disposition of a capital asset—taxpayer's shares in Command—and thus the expenses associated with the subordinated stock are not controlled by the decisions in, *e. g., Woodward v. Commissioner*, 397 U.S. 572, 577, 90 S.Ct. 1302, 1306, 25 L.Ed.2d 577 (1970) or *Redwood Empire Savings & Loan Association v. Commissioner*, 628 F.2d 516, 520 (9th Cir. 1980). This is essentially a factual finding, reviewable only to determine if it is clearly erroneous. *Thompson v. Commissioner*, 631 F.2d 642, 646 (9th Cir. 1980); *Geneva Drive-In Theater, Inc. v. Commissioner*, 622 F.2d 995, 996 (9th Cir. 1980). In the present case, the finding is supported by the record and is not clearly erroneous, and the Commissioner does not contend otherwise.

but can be recovered only as capital costs. *Kasey v. Commissioner*, 457 F.2d 369, 370 (9th Cir.), *cert. denied*, 409 U.S. 869, 93 S.Ct. 197, 34 L.Ed.2d 120 (1972); *Spangler v. Commissioner*, 323 F.2d 913 (9th Cir. 1963); *Boagni v. Commissioner*, 59 T.C. 708 (1973); Treas. Reg. § 1.263(a)–2 (1958). Those expenses are normally added to the property's basis and are recovered, if ever, either by depreciation deductions or, in the case of non-depreciable property, by a corresponding reduction in realized gain on sale or disposition of the property. I.R.C. §§ 167, 1001, 1011, 1012, 1016.

The Commissioner asks us, as he did the Tax Court, to apply this rule to the taxpayer's expenditures to obtain the return of the loaned securities. Despite some contrary intimations by the Commissioner, there is no real argument in this case that title to the subordinated securities was actually at issue in the return transaction. The Commissioner urges, however, that the various provisions of the subordination agreement so impaired taxpayer's rights in the securities as to be treated as "clouds" on title. When the securities were returned to taxpayer they were no longer encumbered by the "clouds." Expenses to obtain their return thus served to remove the "clouds" and, following the same reasoning that requires capitalization of the expenses of perfecting title, ought to be capitalized.

The relevant features of the 1964 and 1969 subordination agreements are as follows. The agreement provided that Command could use the securities in its business and hypothecate them to secure loans from banks or other lenders. Command was empowered to use the borrowed securities or the proceeds of any sale or pledge thereof as part of its capital, subject to the risks of the business. Taxpayer could withdraw any of the securities upon substituting cash or other securities of comparable quality and value. Upon termination of the loan, any cash or securities belonging to taxpayer would be returned to her, and if the exact securities were not available Command agreed to deliver to taxpayer securities which were acceptable to her and of comparable quality and value. The agreement

further provided that the right to demand or receive payment or return of the borrowed securities, whether in the form of securities or cash, was expressly subordinated to the claims of all present and future general creditors of Command. The agreement did not provide for any interest payment in consideration for the use of the securities by Command; however, all dividends from the borrowed securities were transferred to taxpayer by Command. In addition, taxpayer apparently retained the right to vote the shares of stock that were loaned to Command.

The Commissioner argues that under this agreement, "taxpayer virtually ceded all her title and interest in the securities to Command." Pointing to the various provisions, the Commissioner asserts that "there is absolutely no room to dispute that Command and Command's creditors had claims to title that, at the very least, 'clouded' taxpayer's ownership interests.... As long as those shares remained in Command's possession, taxpayer had merely an income and remainder interest in them— and both those interests were subject to so many conditions as to render them almost expectancies until they vested in possession.... Not until she regained possession—and then only if the [return of securities] satisfied all conditions set forth in the subordinated loan agreements—could taxpayer begin to assert that the securities were really 'hers.'" Reasoning, therefore, that "the legal expenses in this case arose from the taxpayer's attempt to remove the substantial cloud the subordinated loan agreements she executed left hanging over unfettered title to the investment properties," the Commissioner urges that they be treated as capital expenses to clear title.

The Tax Court, viewing the same subordination agreements (but without benefit of the Commissioner's "cloud-on-title" argument), found contrary to the Commissioner:

[T]he facts in the instant case demonstrate that the legal expenses paid by petitioners in no manner related to the title of the securities lent to Command.

To the contrary, the subordinated loan agreement provided that Command had only the right to the beneficial enjoyment of the lent securities to pledge them as collateral. Title to these securities remained at all pertinent times with petitioners. Command was obligated to return the securities to petitioners upon termination of the loan agreement. In the event Command was unable to return the exact securities, it was obligated to deliver to petitioners securities which were acceptable to them in terms of comparable quality and equivalent market value. Likewise, petitioners retained the right to withdraw the lent securities upon substituting cash or securities of a comparable quality or value.

70 T.C. at 201.

■ A number of considerations persuade us to affirm the Tax Court on this point.[6] The subordination agreements at issue here are the creature of the peculiar requirements of the brokerage industry. Their many terms, addressed as they are to contingencies that will not necessarily occur, respond to considerations which may have little or no applicability in other contexts. Thus, as Judge Sneed pointed out in a comparable setting, "[t]his case presents precisely the type of issues with respect to which we should accord substantial deference to the Tax Court. The resolution of such technical issues affecting a single industry is a task for which the Tax Court is well suited." *Allstate Savings & Loan Association v. Commissioner*, 600 F.2d 760, 762 (9th Cir. 1979), *cert. denied*, 445 U.S. 962, 100 S.Ct. 1649, 64 L.Ed.2d 237 (1980). This court has frequently recognized its obligation to accord respect to the views of the Tax Court. "Opinions of the Tax Court reflect 'that degree of special expertise which Congress has intended to provide in that tribunal.' *Sibla v. Commissioner*, 611 F.2d 1260, 1262 (9th Cir. 1980). Therefore we 'should not overrule that body unless some unmistakable question of law mandates such a decision.' *Id.*" *Max Sobel Wholesale Liquors v. Commissioner*, 630 F.2d 670, 674 (9th Cir. 1980). These considerations apply with at least as much force where the taxpayer has prevailed below as where the Commissioner has. For these reasons alone, therefore, we would hesitate to reverse the Tax Court's decision on this issue.

■ Beyond considerations of deference, however, we find ourselves somewhat uncomfortable with the principle urged by the Commissioner in this case. Many restrictions incident to agreements entered into in the course of managing income-producing property could be analogized to "clouds on title," and it would not require an expansive application of this principle to swallow up numerous deductions heretofore legitimate under section 212(2). We are not prepared to take the step asked by the Commissioner in extending the rule concerning defense or perfection of title where issues of validity of title or possible competing claims are as attenuated as they are here.[7]

■ When the subordination agreements are viewed in their entirety, the Commissioner's argument loses force. The securities remained in the lender's name at all times. Command's basic obligation was to return the same securities that taxpayer

---

**6.** The appropriate standard of review for a Tax Court finding that, as here, presents a "mixed" question of fact and law is somewhat unclear, *see Thompson v. Commissioner*, 631 F.2d 642, 646 (9th Cir. 1980), but we need not attempt to resolve that problem at this time. Our inquiry is not whether the rule regarding title-related expenses should *ever* be extended to situations where title is not technically at issue, but whether the Tax Court erred, under the facts and circumstances of this case, in declining to extend the rule *here*. Because we agree with the Tax Court's decision, we have no occasion to say whether a "clearly erroneous" standard, *Parkside, Inc. v. Commissioner*, 571 F.2d 1092, 1094 (9th Cir. 1977), or a more searching standard, *Estate of Franklin v. Commissioner*, 544 F.2d 1045, 1047 n.3 (9th Cir. 1976), should apply.

**7.** This is not to foreclose the possibility that expenses in a future case, although not technically in defense or perfection of title, might share such similar attributes as to make capitalization appropriate. We merely decline to extend the rule in this case.

had lent. Taxpayer also had the option to regain possession of the loaned securities upon substituting cash or securities of comparable quality and value. Taxpayer received all dividends and retained the power to vote the securities. The risk of decreased value or the benefit of increased value of the securities remained with taxpayer at all times. In our view, the Tax Court correctly reasoned that the agreements did not impair title in light of all the circumstances.

█ It is true that in the event Command could not return the exact securities lent, it could fulfill the agreement by supplying other securities acceptable to taxpayer and of a comparable quality and market value. It is also true that the last agreement signed by taxpayer, in connection with the 1971 extension of the return date, stated that "[t]he Lender does not reserve or retain any property rights in the Securities loaned as aforesaid but the Lender's rights hereunder shall consist solely of the contractual right against the Firm for the repayment of said loan in the manner herein specified." These clauses did not exist *in vacuo*, however. In the context of the overall nature of the undertaking that these agreements represent, it is clear that these terms neither granted Command a general power to sell nor worked a divestiture of taxpayer's rights in the securities. As the court in *Stahl v. United States*, 441 F.2d 999, 1002 (D.C. Cir. 1970) pointed out in examining a similar subordination agreement:

> What is more fairly intended to be conveyed was the power to sell upon the appearance of the need and occasion contemplated by the agreement, the unfulfilled demands of the firm's creditors. The power to sell, by fair implication, is a power conveyed for response to a contingency.

We think the instant agreements have the same character, and thus that in the absence of a contingency, the taxpayer retained the significant rights of ownership vis-à-vis Command.

█ Similarly, we do not attach to the "property rights" clause the significance that the Commissioner does. Despite the apparent meaning of that clause taken out of context, it remains true that Command's basic obligation under the agreement was to return the same securities that were loaned to it. Taxpayer's relinquishing of property rights in the securities could have significance only where an equitable claim on her part might defeat the interest of a third party buyer of the securities in the event of Command's insolvency. The clause, in other words, removes an impairment to the value creditors could receive in a liquidation of Command's assets. *See Miami National Bank v. Commissioner*, 67 T.C. 793, 802–03 (1977). It furthers the purpose of the subordination agreement in providing security for those with whom Command conducted business. In the absence of a financial contingency, however and in view of the eventual return of the securities, it is apparent that taxpayer did not, merely by signing this agreement, relinquish ownership of the securities. It follows that terminating the agreement did not enhance petitioner's ownership in the securities nor create any new rights of title.

█ In holding as we do, however, we must stress the absence of factors that might well change the picture completely. In particular, we note that no creditors had asserted any claims against Command that might jeopardize taxpayer's interest in the securities. The firm was not insolvent, *Stahl v. United States, supra*, nor even in severe financial difficulty, *Lorch v. Commissioner*, 605 F.2d 657 (2d Cir. 1979), *cert. denied*, 444 U.S. 1076, 100 S.Ct. 1024, 62 L.Ed.2d 759 (1980). It had not sold or converted the securities, and the record discloses no threat that such action was imminent. Thus, although the risk existed that insolvency might force Command to sell taxpayer's shares to satisfy creditors, the mere risk of such action did not put taxpayer's title in issue nor constitute a "cloud" on title.

It was not error, therefore, for the Tax Court to rule that the disputed expenses did not fall within the rule regarding "defense or perfection of title."

## II. EFFECT OF TREASURY REGULATION § 1.212–1(k)

The Commissioner also argues that the deduction sought by taxpayer is barred by the terms of Treasury Regulation § 1.212–1(k). Part of that regulation, the full text of which is set forth in the margin,[8] restates the rule we have discussed above regarding expenses to defend or protect title to property. Another portion of the regulation, however, presents a different question. That portion states, in pertinent part:

> Expenses paid or incurred ... in recovering property (other than investment property and amounts of income which, if and when recovered, must be included in gross income) ... constitute a part of the cost of the property and are not deductible expenses.

Treas. Reg. § 1.212–1(k) (1957).

The Commissioner states that taxpayer's legal fees were devoted to the recovery of property and that the expenses are therefore not deductible. The taxpayer responds that the parenthetical exception to the regulation exempts expenses for the recovery of "investment property" from the general rule of the regulation, and thus that the regulation does not affect taxpayer's expenses. The Commissioner replies that the parenthetical exception for investment property applies only in cases where that property, if and when recovered, must be included in gross income, and that taxpayer's property does not qualify.

The interpretation of this portion of the regulation seems to have been an issue of first impression for the Tax Court, and it certainly is so for us. Apart from the Tax Court's own opinion in this case, we have found no reported decision applying or construing the term "recovering property," nor attempting to resolve the ambiguities in the regulation. We can appreciate the Tax Court's struggle in endeavoring to do so. As will be seen below, we feel the Tax Court's analysis of the regulation did not go quite far enough. It appears, however, that the Tax Court nonetheless reached the correct result in this case.

█ The term "recovering" is nowhere defined in the regulations, but the context makes clear what sorts of transactions the drafters must have had in mind. Putting aside for a moment the much-mooted parenthetical exception, the regulation states that "[e]xpenses paid or incurred ... in recovering property ... constitute a part of the cost of the property and are not deductible." The regulation thus denotes the *reason* costs of "recovery" are nondeductible: they are capital in nature. It does not address nondeductibility in situations where an expense does not qualify as ordinary and necessary, or where it is not devoted to "management, conservation, or maintenance" of property, nor where the expense is personal rather than related to property held for the production of income. The regulation looks only to the question of whether an expenditure is capital. It follows, therefore, that "recovering" property, to be classified as capital, must possess attributes of the same sort that cause the costs of improvements to property, of defense or perfection of title to property, or of acquisition or disposition of property, to be classified as capital.

At the same time, it becomes clear that the *only* function the parenthetical exception can serve, consistent with the remaining language of the regulation, is that of identifying situations where an expenditure is *not* capital. With this principle in mind, we should be able to attempt a reading that comports with the statutory framework under which the regulation was issued.

---

8. "(k) Expenses paid or incurred in defending or perfecting title to property, in recovering property (other than investment property and amounts of income which, if and when recovered, must be included in gross income), or in developing or improving property, constitute a part of the cost of the property and are not deductible expenses. Attorneys' fees paid in a suit to quiet title to lands are not deductible; but if the suit is also to collect accrued rents thereon, that portion of such fees is deductible which is properly allocable to the services rendered in collecting such rents. Expenses paid or incurred in protecting or asserting one's rights to property as heir or legatee, or as beneficiary under a testamentary trust, are not deductible." Treas. Reg. § 1.212–1(k) (1957).

■ The need for an exception relating to "amounts of income which, if and when recovered, must be included in gross income," is plain enough. Without such an exception, the regulation would contradict section 212(1) of the statute itself which allows a deduction for the costs of "collection of income."

Far more troublesome, however, is the exception for "investment property." As the issues have been framed in this appeal, it seems we must determine not only what the term means, but whether the ambiguous phrasing of the exception subjects "investment property" to the further requirement that it, like recovered income, must be includible in gross income on recovery to satisfy the exception.

The Tax Court, analogizing "recovery" of property to "conservation" of property, took the position that investment property need not be includible in gross income on recovery to qualify for deduction:

Section 212(1) and (2) of the Code must be read together when interpreting the parenthetical portion of section 1.212–1(k), Income Tax Regs. The recovery of amounts of income refers to section 212(1) which provides for the deduction of expenses paid or incurred for the production or collection of *income*. In this regard the recovery of income must be included in gross income before the deduction is allowable. See sec. 1.212–1(e), Income Tax Regs., and sec. 265. Expenses for the recovery of *property* come under the provisions of section 212(2) and the deduction is allowable only if the property is held for the production of income.

70 T.C. at 202–03. The Tax Court used this reasoning to explain its holding that a deduction was available to the taxpayer in this case:

An expense paid or incurred for acquisition of property is not deductible and must be added to the cost of the property recovered in the event the property is *not* held for the production of income. By contrast, the parenthetical portion of section 1.212–1(k), Income Tax Regs., as we interpret it, allows a deduction for ex-

penses paid or incurred for the recovery of investment property which by its very nature is held for the production of income.

70 T.C. at 202.

■ While this approach has a certain logic so far as it goes, our earlier discussion makes clear that it does not go far enough. The critical inquiry in interpreting this regulation is for distinctions between capital and non-capital transactions. The Tax Court's interpretation is unsatisfactory because no such distinction, turning solely on whether property was held for the production of income, transforms a capital expenditure into an ordinary and necessary expense. To the contrary, an expenditure classified as capital in relation to property not held for the production of income would retain that capital character in relation to property held for the production of income.

Thus if "recovery" generates capital expenses, in the same way that, for instance, defense or perfection of title does, then it would not matter whether or not the recovered property was held for the production of income. If the term "investment property" means the same thing as "property held for the production of income," as the Tax Court found, it would make no sense to except investment property from the denial of deductibility for a capital expense. Indeed, such an exception would be contrary to the dictates of section 263 of the Internal Revenue Code.

■ For similar reasons, however, we cannot accept the Commissioner's position that the problems in interpreting the regulation can be solved by requiring the value of "investment property" to be includible in gross income on recovery in order to escape the regulation's bar to deductibility. Again, the crucial inquiry is for distinctions between capital and ordinary expenditures. We can see no reason why the parenthetical exception should be so worded as to allow the deduction only where the property that must be included in gross income on recovery is "investment" property. Recovery of *any* sort of property wherein the value of the recovered property must be included in

gross income seemingly ought to qualify. At the same time, we are troubled by the possibility that this reading of the regulation might serve to extend deductibility to "recovery" costs associated with the sale or disposition of capital assets where, under the principle of *Woodward v. Commissioner,* 397 U.S. 572, 90 S.Ct. 1302, 25 L.Ed.2d 577 (1970), such costs should be offset against the gain realized rather than deducted from ordinary income.

■ It should be clear at this point that the proper focus of inquiry must be the term "recovering" itself, rather than the ambiguous parenthetical exception. The transactions contemplated by this term must possess attributes that would cause us to classify associated expenditures as capital. Transactions not possessing those attributes, though perhaps falling within the everyday meaning of "recovery," could not fall within the meaning of the term as used in this regulation.

We cannot and should not, within the confines of the case before us, attempt an authoritative definition of "recovering property" under the regulation. We can say only that the term must refer to instances where ownership, having been lost or relinquished, has been restored. An expense in recovering property would thus constitute an expense to secure the right to future income (including appreciation in value) from the property, comparable to an expense of defense or perfection of title, rather than simply an expense to manage or conserve the property in the manner made deductible under section 212(2).

■ For essentially the same reasons stated earlier with respect to the defense or perfection of title issue, we feel that taxpayer's expenses do not rise to the level of "recovery" expenses under the regulation. Because we hold that the taxpayer's transaction was not a "recovery," we have no occasion to determine the precise meaning of the regulation's parenthetical exception for "investment property." Resolution of that puzzle must await another case.

* The substitution of Secretary of the Army John O. Marsh, Jr. for former Secretary of the Army

## CONCLUSION

The Tax Court, having determined that the taxpayer's expenditures were not capital, expressly found that they were ordinary and necessary expenses to " 'manage, conserve, and maintain' their investment property." 70 T.C. at 202; *see Trust of Bingham v. Commissioner,* 325 U.S. 365, 373–74, 65 S.Ct. 1232, 1236–37, 89 L.Ed. 1670 (1945). This finding is supported by the record and is not clearly erroneous. *Geneva Drive In Theater, Inc. v. Commissioner,* 622 F.2d 995, 996 (9th Cir. 1980). The decision of the Tax Court, allowing the deduction under review, is therefore

AFFIRMED.