ESTATE OF NORMA F. ALLEN, DECEASED, AND GEORGE L. ALLEN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Allen v. Commissioner
Docket Nos. 6437-78, 8006-80.
United States Tax Court
T.C. Memo 1982-303; 1982 Tax Ct. Memo LEXIS 443; 44 T.C.M. (CCH) 9; T.C.M. (RIA) 82303; June 2, 1982. Donald J. Forman and Howard A. Weinberger, for the petitioners. William P. Lowrance and Linda L. Wong, for the respondent. FEATHERSTON
MEMORANDUM FINDINGS OF FACTS AND OPINION FEATHERSTON, Judge: Respondent determined deficiencies in the Federal income tax of George L. and Norma F. Allen in the amounts of $ 6,429.47, $ 4,414.10, and $ 1,738 for 1974, 1975, and 1976, respectively. For 1974 and 1975, respondent also determined additions to tax under section 6653(a). [1] After concessions by both parties, three issues remain for decision: 1. Whether petitioners may deduct certain legal fees as business expenses under section 162(a) or as expenses incurred in the management or conservation of their property under section 212(2), or whether such expenses must be capitalized under section *445 263(a); 2. Whether petitioners may deduct certain payments as business bad debts under section 166(a) or whether the payments are to be treated as nonbusiness bad debts under section 166(d); and 3. Whether any part of petitioners' underpayment of income tax for 1974 and 1975 was due to negligence or intentional disregard of the rules and regulations within the meaning of section 6653(a). FINDINGS OF FACT At the time of filing the petitions in these cases, George L. Allen (Allen or petitioner) and his wife, Norma F. Allen (Mrs. Allen) were legal residents of Dallas, Texas. They timely filed joint Federal income tax returns for 1974, 1975, and 1976 with the Internal Revenue Service Center, Austin, Texas. Mrs. Allen died on January 24, 1981. Her estate was not admitted to probate or otherwise subject to the administration of any court; it is now represented by her heirs. During much of his career, petitioner has been involved in the life insurance industry. Following his 1931 graduation from college, where he majored in accounting, he worked until 1958 for a number of life insurance companies as an agent, auditor, district manager, education director, supervisor, and *446 manager. During the latter part of this period and continuing through 1975, petitioner also operated an accounting firm under the name of George L. Allen & Company. At certain times this accounting practice consumed a considerable portion of petitioner's working hours. The company's work included the preparation of income tax returns. For some time prior to 1958, petitioner was part owner and executive vice-president for Excelsior Life Insurance Company (Excelsior). When this company was sold in 1958, petitioner sought to purchase a life insurance company with the proceeds he received for his ownership interest in Excelsior. In 1958, petitioner discovered a life insurance company in Fort Worth, Texas, that was available for purchase. This company, Deliverer Life Insurance Company (Deliverer), was a limited capital stock company, having the minimum amount of life insurance to qualify for a charter according to the laws under which it was organized (250 policies, each at $ 1,000 face value); Tex. Ins. Code Ann. art. 303 (1951). For all practical purposes, Deliverer's principal value was its charter. To finance this acquisition, petitioner brought together approximately *447 12 businessmen, prominent and successful figures mostly from the Dallas community. The group purchased Deliverer's stock for a total consideration of $ 37,500. Petitioner and the members of his immediate family, with approximately 18 percent of the outstanding stock, were the largest shareholders of the newly acquired company. While other members of the purchasing group were members of the board of directors, only petitioner was also an employee of the newly acquired company, serving as its president and chief executive officer. Since the group had purchased essentially a bare corporate charter, petitioner bore the responsibility for developing and managing the company, by, for example, establishing an agency department, finding and training agents and developing policy forms. Petitioner continued to operate his accounting business during this period. The name of the insurance company was changed from Deliverer Life Insurance Company to Great Liberty Life Insurance Company and was known by its acronym, GLLICO. Its home base was moved to Dallas. GLLICO's home office was initially located on half of the second floor of a building situated on Ross Avenue in Dallas (the Ross *448 Avenue building). This building was owned by Mrs. Allen and was held by her as income-producing property; it was suitable only for rental to businesses. In approximately 1959 or 1960, GLLICO's district office moved into the remainder of the second floor of the Ross Avenue building. For the first 3 years, Mrs. Allen did not charge GLLICO any rent on the Ross Avenue building, nor did petitioner draw any salary from GLLICO. In approximately 1961, however, Mrs. Allen commenced receiving rent at the rate of $ 3,300 per year; this rate held steady through the years in question, while the first floor was rented in 1967 for $ 3,420. Also in 1961, petitioner began drawing a salary of $ 400 per month; in addition, GLLICO reimbursed petitioner for travel expenses that he incurred. GLLICO's business moved, as petitioner characterized it, from "[b]ad to worse." GLLICO lacked the capital needed to acquire more policies, which at that time generally were obtained in one of two ways: either by purchasing "blocks" of insurance from other companies, on which the premium income was "practically guaranteed"; or by deploying a sales force large enough to sell new insurance policies. Moreover, *449 GLLICO had been selling an "industrial" life insurance that had been profitable only if dealt with in large volume, and which was becoming increasingly obsolete. Geared to low and middle income people, this industrial insurance depended upon door-to-door canvassing, with premiums collected weekly or monthly. The frequent auditing required for this type of business caused most large companies to convert to "ordinary type" insurance calling for premiums to be paid annually, semi-annually, or quarterly. Premium income was, in the words of a stockholder report, at best "some what [sic] discouraging." On fairly frequent occasions, investors were called upon to contribute additional capital, in order to provide adequate working capital, to meet operating expenses, and to meet surplus requirements. On such occasions prior to January 1966, petitioner had contributed a substantial amount of additional capital to the company. In 1966, Clay Cotten, then Texas Commissioner of Insurance, informed petitioner that an existing impairment in GLLICO's surplus account would have to be rectified. Under the rules of the Commission, GLLICO's surplus was required to be 50 percent of its capital. *450 The implication was that, if this impairment in surplus was left uncorrected, an order would be issued forbidding GLLICO from writing any further insurance. GLLICO's surplus, which had at one point been $ 50,000 with capital at $ 100,000, had been entirely depleted, along with approximately $ 10,000 of the capital, thus necessitating replacement of around $ 60,000. After Commissioner Cotten's warning, petitioner attempted to replenish the surplus by appealing to GLLICO's board of directors. Members of the board, including petitioner, contributed a total of $ 10,000. In order to fill the remaining gap of approximately $ 50,000, petitioner convinced his wife to put a mortgage on the Ross Avenue Building. This building had an appraised value of $ 80,000 in 1966. Following board approval on May 4, 1966, petitioner and Mrs. Allen signed a $ 60,000 note payable to GLLICO, secured by a deed of trust, dated May 30, 1966, on the Ross Avenue Building and contributed the note to the company (the Ross Avenue transaction). The note was due in 5 years with interest accruing at 4-1/2 percent per year. All interest payments were subsequently waived pursuant to a shareholder resolution of *451 March 14, 1967. The note and deed of trust were reported to Commissioner Cotten, and he permitted the company to remain in business. At the May 4, 1966, board meeting, at which the Ross Avenue transaction was approved, the directors approved two conditions for the repayment of the mortgage note: If GLLICO acquired sufficient surplus to permit its repayment, or if GLLICO's property and assets were sold and policyholders reinsured with another company and the proceeds exceeded debts, the shareholders and directors would make a "contribution" from GLLICO's surplus in a sum of money equal to the "gift," i.e., $ 60,000. The $ 60,000 note was referred to in this resolution as a "contribution" or a "gift," as were the cash contributions totaling $ 10,000, made by some of the directors; these cash contributions were to be repaid on conditions similar to the conditions relating to repayment of the Ross Avenue note. The preamble to the resolution states that the note was executed by petitioner and Mrs. Allen "in order to protect the shareholders and policy holders" of GLLICO. Because of GLLICO's precarious financial condition, petitioner had been actively searching for companies with *452 which GLLICO could merge. While GLLICO did not have sufficient capital to obtain financial independence, petitioner thought that merger with or acquisition by another company might enlarge the capital pool and reduce operating costs, so that some degree of prosperity might result. Petitioner increased these search activities after the Ross Avenue transaction was completed. In the mid to late 1960's, petitioner enjoyed a reputation as a leader in the black community in Dallas. He was a member of numerous civic and political organizations, including the City Planning Commission, the Dallas Negro Chamber of Commence's board, the Dallas United Fund, the Board of Adjustment, the Citizens Charter Association (a political group on the city level), and, ultimately, the City Council where he rose to become Vice Mayor of the City. He was the first elected black man in Dallas City government. At the time of the trial of this case, petitioner was serving as a justice of the peace. He also was the founder and president of Southwest School of Business Administration. Given his standing and visibility in the Dallas community, as well as his long experience in the life insurance business, *453 petitioner thought that he might be able to negotiate for an executive position with any other insurance company that took over GLLICO. One of his objectives in effecting a merger for GLLICO was to secure for himself such an executive position in the new enterprise. Petitioner, who was approximately 57 years of age in 1966, reasoned that his reputation, experience, and GLLICO's assets (which, while insufficient to support one company, would be of some value to a larger, merged enterprise) might well lead a company to retain him, and that, if no merger was effected, his standing as the ex-president of a failed life insurance company would hinder him in gaining any future employment. Petitioner's efforts culminated in 1968 in an agreement with Jay F. Dodd (Dodd), an Arizona insurance executive (the Dodd transaction). Pursuant to a contract executed February 22, 1968, certain GLLICO stockholders (the Allen group), as sellers, transferred 52 percent of the outstanding stock of GLLICO to a newly formed holding company, First Texas Holding Company (referred to as First Texas or the holding company). In exchange they received 48 percent of First Texas' stock, the remaining 52 percent *454 being held by Dodd. After completion of this transaction, petitioner and his family owned, directly and indirectly, approximately 10 percent of GLLICO's stock. The board of directors of First Texas was comprised of six persons appointed by Dodd and five persons appointed by the Allen Group. Also placed under the First Texas Holding Company control were two small Arizona insurance companies, and Metro Media, a marketing company which was in charge of sales and of training insurance agents. At the time of the stock transfers, Dodd, as purchaser, also transferred certain assets to GLLICO. These transfers included a $ 65,000 corporate note purportedly executed by C & S Land and Development Company, Inc., an Arizona Corporation (C & S Co.), as well as approximately $ 10,000 in cash and certain insurance then in force. In addition, Dodd transferred to GLLICO a $ 60,000 note also purportedly executed by C & S Co. and secured by Arizona property; subject to the approval of the Insurance Commissioner, this note was to substitute for petitioner's and Mrs. Allen's $ 60,000 note and deed of trust on the Ross Avenue property (the substitute note). The transaction was approved as planned *455 and, on or about April 30, 1968, the Ross Avenue note was released and returned to Mrs. Allen. As part of the same transaction, GLLICO entered into an employment contract, dated May 1, 1968, with both petitioner and Dodd. The contract provided that petitioner was to be employed as president and chief executive officer of GLLICO, at a base pay of $ 1,000 per month. This base pay was to be augmented monthly according to the following formula: 1/12 of 4.8 percent of GLLICO's annualized premium income up to $ 250,000; 1/12 of 4.4 percent of premium income between $ 250,000 and $ 350,000; 1/12 of 4 percent of premium income between $ 350,000 and $ 450,000; and 1/12 of 2 percent of premium income exceeding $ 450,000. In addition, the company agreed to reimburse petitioner for business expenses and to provide certain insurance coverage. The employment contract specified that petitioner could not engage in activities that might detract from his services to GLLICO. During the 5 months prior to GLLICO's entry into conservatorship on September 4, 1970 (infra), petitioner did not cash his monthly $ 1,000 paycheck and never collected this $ 5,000 in salary. Despite GLLICO's overhaul, *456 it continued to falter. While it was a stronger company with more insurance in force and more premium income, it encountered additional problems particularly with accident and health insurance policies. At that time, hospitals' and health care centers' rates as well as doctors' fees escalated greatly; and GLLICO's scanty resources were fast being depleted by drains on its capital. Following the Dodd transaction, in 1969 or the first half of 1970, GLLICO borrowed money from the Mansfield State Bank (Mansfield or the bank). The bank required that petitioner, Dodd, and Dorsey Adams (a shareholder and director) all guarantee the notes. Despite a series of renewals, GLLICO was unable to pay the notes and Mansfield called upon the three guarantors to pay. On November 12, 1971, Mansfield obtained a joint and several judgment on notes guaranteed by petitioner, Dodd and Adams. The entire judgment of approximately $ 117,000 was satisfied by Adams alone. Because Dodd had been killed in an automobile accident just prior to entry of the judgment, and his estate contributed nothing, petitioner executed a note to Adams for one-half of the amount ($ 58,688.53), payable at $ 500 a month. *457 He deducted these payments on his 1974, 1975, and 1976 income tax returns as business bad debts. GLLICO went into State conservatorship on September 4, 1970, and into receivership on November 9, 1971. In 1971, the conservator (who later became receiver and is hereinafter referred to as receiver), brought suit on the $ 65,000 note and the $ 60,000 substitute note purportedly executed by C & S Co. This suit was unsuccessful because the Arizona court found that Dodd did not have the right or authority to act on behalf of C & S Co., and that the promissory notes were thus null and void. The receiver then brought a lawsuit on behalf of GLLICO against petitioner and Mrs. Allen (Great Liberty Life Insurance Co. v. George L. Allen and Norma F. Allen, 68th Judicial District Court of Texas, No. 74-4707-C). The receiver alleged that petitioner violated his fiduciary duty in accepting the release and prayed for judgment against the Allens (1) cancelling the purported release of the lien on the Ross Avenue property arising out of the Dodd transaction; (2) ordering payment of $ 60,000 plus interest, punitive damages of $ 120,000, and reasonable attorneys fees; (3) foreclosing the lien *458 on the Ross Avenue property and ordering it sold; (4) declaring a constructive trust of the Ross Avenue property for the benefit of GLLICO in order to secure the $ 60,000 note; and (5) ordering payment of costs and other relief. In its complaints, the receiver alleged that the Allens' motivation in executing the note and deed of trust on the Ross Avenue property was to ensure that the business continue so that they could reap the benefits accruing from salary, expense accounts, and rental payments. The Allens answered this allegation in part by stating that no law was violated by their receiving salaries, expense accounts or rental payments. Following a lenghty trial, a judgment was entered against the Allens, directing payment of a substantial sum and foreclosure of the Ross Avenue lien. The case was appealed to the Texas Court of Civil Appeals ( Allen v. Great Liberty Life Insurance Co.,522 S.W.2d 247 (Tex. Civ. App. 1975)). Because certain prejudicial evidence was admitted, the appellate court reversed and remanded the case; following the reversal, the parties settled their suit. According to the Federal income tax returns for 1968, 1969, and 1971 [2] *459 petitioner and Mrs. Allen had income as follows: 1968
1969
1971
Total Gross Income [1]
$ 24,641.91
$ 35,170.29
$ 18,844.66
Adjusted Gross Income
13,465.84
18,836.59
3,389.50
GLLICO Salary
10,200.00
12,000.00
In connection with the trial and appeal of the case brought by the GLLICO receiver, petitioner was represented by a Dallas law firm to which he paid legal fees in 1974, 1975, and 1976; it has been stipulated that these amounts were reasonable. In their Federal income taxes for the pertinent years, petitioner and Mrs. Allen claimed the following deductions: GLLICO Bad Debt
Year
Legal Fees
Payments
Total
1974
$ 8,667.97
$ 7,271.94
$ 15,939.91
1975
3,250.00
5,500.00
8,750.00
1976
3,785.00
6,000.00
9,785.00
Respondent denied these deductions from ordinary income in 1974 and 1975 on the grounds (1) that the "legal fees attributable to rental property [were] capital expenditure[s] within the meaning *460 of section 263," and (2) that the GLLICO payments in respect of the Mansfield State Bank guaranties created nonbusiness bad debts deductible only as short-term capital losses. Also denied as business bad debts in 1974 and 1975 were a $ 1,000 and a $ 2,119.30 debt from Tecog Service Industries, Inc. (Tecog). Respondent allowed a nonbusiness bad debt deduction of $ 1,000 in both 1974 and 1975. In addition, respondent determined that additions to tax for negligence (sec. 6653(a)) for 1974 and 1975 in the amounts of $ 321.47 and $ 220.71 were due. OPINION 1. The Legal Fees
In order to prevent the threatened forfeiture of GLLICO's charter, petitioner and his wife in 1966 contributed to the company's capital their $ 60,000 note secured by a deed of trust on the Ross Avenue income-producing building owned by Mrs. Allen. In this manner, GLLICO met the Texas Insurance Commissioner's capital surplus requirements. Later, in 1968, GLLICO accepted a note secured by a mortgage on a piece of Arizona property as a substitute for petitioner's Ross Avenue note and mortgage, which GLLICO then released. GLLICO subsequently failed and went into State receivership. The receiver sued petitioner *461 and Mrs. Allen, alleging that petitioner violated his fiduciary duty as a corporate officer and director by accepting the substitution of the Arizona note and mortgage for the Ross Avenue note and mortgage, and praying that the release be rescinded. Petitioner expended certain reasonable legal fees to contest the suit and here claims the fees as an ordinary and necessary expense deduction. The deductibility of "ordinary and necessary" expenses is governed by two separate sections--section 162(a) [3] for business expenses paid or incurred "in carrying on any trade or business" and section 212(2) [4] for expenses paid or incurred "for the management, conservation, or maintenance of property held for the production of income" [5] Petitioner relies mainly upon section 212(2). To decide whether legal fees may be deducted under either one of these sections or must be capitalized under section 263(a), [6] courts look to the origin and character of the claim with respect to which the expense arose. Woodward v. United States,397 U.S. 572, 577-578 (1970); see United States v. Gilmore,372 U.S. 39, 48, 49 (1963). If the claim originated in a capital transaction, *462 no ordinary expense deduction is allowable, and the expense must be capitalized. Sec. 263; Anchor Coupling v. United States,427 F.2d 429, 433 (7th Cir. 1970); Boagni v. Commissioner,59 T.C. 708, 713 (1973); Reed v. Commissioner,55 T.C. 32, 40 (1970). In divining the nature of the underlying transaction, the origin of the claim test does not call for a "mechanical search for the first in the chain of events which led to the litigation" but rather requires an examination of all the facts to ascertain the "kind of transaction" our of which the litigation arose. Boagni v. Commissioner,59 T.C. at 713; see United States v. Gilmore, supra at 47-48; Spangler v. Commissioner,323 F.2d 913, 918 (9th Cir. 1963), affg. a Memorandum Opinion of this Court. *463 We think that petitioner incurred the disputed legal fees in what was essentially a capital transaction and they must, therefore, be capitalized. Whether GLLICO's release of the note is viewed as the reacquisition of a capital asset or the removal of a cloud on patitioner's title, the origin of the transaction was capital in nature. The litigation in which the fees were paid involved directly Mrs. Allen's legal title to the Ross Avenue property. The crux of the receiver's action against petitioner and Mrs. Allen was an allegation that the release in 1968 of the insurance company's lien on the Ross Avenue property and the substitution of the C & S Co. note secured by the Arizona property were fraudulent and should be set aside. In defending that suit, the Allens were thus defending their title to the Ross Avenue property. By section 1.263(a)-2(c), Income Tax Regs., and corresponding prior regulations, section 263(a) has been interpreted for many years to require to capitalization of the "cost of defending or perfecting title to property." Boagni v. Commissioner,supra at 711-712. [7]
*464 Petitioner cites Cruttenden v. Commissioner,644 F.2d 1368 (9th Cir. 1981), affg. 70 T.C. 191 (1978), but that case is distinguishable. In Cruttenden, the taxpayers lent securities to a brokerage firm pursuant to a subordinated loan agreement in order to meet the net capital requirements of the regulated brokerage industry. The taxpayers subsequently incurred legal fees in negotiating and executing an agreement for the return of their securities; this Court and the Ninth Circuit allowed deduction of these legal fees under section 212(2). In Cruttenden however, the Ninth Circuit noted that this Court had implicitly found that the origin and character of the claim were not essentially capital and that, therefore, the Woodward reasoning did not control. 644 F.2d at 1372, fn. 5. Moreover, the appellate court held that no real question of title existed in that case; for, while the subordination agreement placed some restrictions on the taxpayer's full ownership of the securities, the agreement was "the creature of the peculiar requirements of the brokerage industry," 644 F.2d at 1374, and any threat to title that *465 it occasioned was so contingent and "attenuated" that it did not impair the taxpayer's title. Cruttenden, supra, 70 T.C. 191, 201, 204 (1978). The brokerage firm had a "basic obligation * * * to return the same securities" that were loaned to it, and the taxpayer's action did not enhance her ownership or title. 644 F.2d at 1375. The appellate court remarked, however, that future cases "not technically in defense or perfection of title, might share such similar attributes as to make capitalization appropriate"; it "merely declined to extend the rule" concerning defense or perfection of title to the attenuated claims made by the peculiar requirements of the brokerage industry. 644 F.2d at 1374, fn. 7. Petitioner can thus take little solace in Cruttenden. Granted, in both cases, income-producing property was transferred to enable a corporation to meet industry standards. The similarities, however, cease there. The originating transaction in the present case was capital in nature. The Allens' ownership of the Ross Avenue property was "enhanced" by the insurance company's release of its lien and the question of title to the property *466 was directly involved in the receiver's lawsuit; the validity of the Allens' title to the property was not "attenuated" as in Cruttenden.644 F.2d at 1374. In Cruttenden, only upon occurrence of a stated contingency would the exact securities not be replaced (and even then, their equivalent would be), while GLLICO was obligated to repay the note to Mrs. Allen only upon the occurrence of certain (rather unlikely) conditions. [8] Given these dissimilarities, we find Cruttenden unpersuasive support for petitioner. [9]
*467 Because of the inherently capital nature of the origin of the claim litigated by the receiver, we hold that respondent correctly denied the legal fees deduction. 2. The Bad Debt Deduction
In late 1969 or in the early part of 1970, petitioner, along with two other shareholders of the insurance company, guaranteed loans by the Mansfield State Bank to GLLICO. When the company failed to pay the notes, judgment in the amount of $ 117,000 was entered against the guarantors, and one of them paid the entire amount of the joint and several liability. In 1974, 1975, and 1976, petitioner made payments to this guarantor on his share of the liability and deducted the payments in full as business bad debts. Section 166 [10] permits deductions for both business and nonbusiness bad debts; in the case of nonbusiness bad debts, however section 166(d) treats the loss deduction as a short-term capital loss. A debt will be characterized as a business bad debt, for which a full deduction is allowable, if there is a "proximate" relationship between the loss and the taxpayer's trade or business; otherwise, it is a nonbusiness bad debt. Sec. 1.166-5(b), Income Tax Regs. This proximate relationship *468 exists in the case of a debt arising from an employee-shareholder's guarantee of a corporation's indebtedness if the taxpayer's dominant motivation at the time of guaranteeing the loans is to protect his salary and job and not to protect his investment. United States v. Generes,405 U.S. 93, 104 (1972); French v. United States,487 F.2d 1246, 1248 (1st Cir. 1973). The character of his dominant motivation is a question of fact on which petitioner bears the burden of proof. Smith v. Commissioner,60 T.C. 316, 318 (1973). *469 In determining a taxpayer's dominant motivation for undertaking a guaranty, [11] the objective is to ascertain the true nature of the debts' [12] expected benefits--whether the anticipated benefits would be in capital form, stemming from increased value of shares of stock or, instead, in the form of salary or other noninvestment income. In essence, the question is how would this petitioner have benefitted had the guaranteed loan not gone bad? TennesseeSecurities, Inc. v. Commissioner,674 F.2d 570 (6th Cir. 1982), affg. a Memorandum Opinion of this Court. The focus in the instant case is on petitioner's *470 motivation at the time he initially guaranteed the loans. French v. United States,supra at 1248. Exactly when he made the guaranties is, however, not entirely certain. Respondent refers us to certain copies of what appear to be Mansfield notes, bearing dates from May 18, 1970, through September 14, 1970 (after GLLICO had gone into conservatorship). He asks us to conclude from these notes that the guaranties were made between May and September 1970, when GLLICO's financial situation was extremely poor, and argues the determination of petitioner's dominant motive must be made as of that time period. Petitioner asserts that these notes are merely renewal instruments, and that the original guaranties were entered into in 1968 and 1969, shortly after the Dodd transaction was completed and GLLICO's outlook was hopeful. His memory of the exact dates was dim, but he testified unequivocally that all the guaranties were entered into by the end of 1969. Were this all the evidence before us, this factual question would be very close. But a report of an Examiner of the Commissioner of Insurance of the State of Texas, as of June 30, 1970, lists three of these Mansfield *471 Bank loans as having dates in May 1970, and one in June 1970. [13] While the face amount of these listed notes does not equal the total found due by court action in 1971, this report is the only objective evidence was have as to the initial making of any of the notes. The odd amounts of at least two of the listed notes (e.g., $ 9,827.77 and $ 6,870) suggest they were renewals. In light of all the evidence, we find that the notes were initially guaranteed not later than the end of 1969, as petitioner testified, or during the first 6 months of 1970, and we shall use that time period for determining petitioner's dominant motive in making the guaranties. The subjective motivation of an employee-shareholder for guaranteeing his employer-corporation's loans is perhaps always mixed to some extent. As a general rule, *472 objective factors rather than oral declarations are the most reliable guides for determining the dominant motivation and expected benefits. United States v. Generes,supra at 104, 106. Again, this case presents a close question of fact, but, weighing all the evidence, we think that petitioner's dominant motivation for guaranteeing the loans was to protect his job and his future salary. We begin with the objective fact that petitioner's career had been spent almost entirely in the insurance industry. In 1970, petitioner was approximately 61 years old, and he believed that, as the former head of a failed insurance company, his prospects for new employment would be very slim indeed. To be sure, as we shall discuss, he was receiving small amounts of income from his accounting business, his real estate holdings, and his City of Dallas employment but not enough to support himself and his family. His GLLICO salary was the major component of his livelihood. Petitioner's 1970 income tax return is not of record, but we glean from his 1968 and 1969 returns that he drew a pre-tax salary from GLLICO of $ 10,200 and $ 12,000, respectively. Respondent seeks to discount *473 the importance of GLLICO salary by showing that, from other sources of income, petitioner received gross income in those years of $ 14,441.91 and $ 23,170.29, respectively. Petitioner contends, however, and we agree, that the truly relevant figures are the amounts of adjusted gross income from other sourcess--a negative amount of $ 34.16 in 1968 and only $ 3,536.59 in 1969 when the salary income and the $ 3,300 in rental from GLLICO [14] are eliminated. His adjusted gross income, eliminating only the GLLICO salary, was a modest $ 3,265.84 in 1968 and $ 6,836.59 in 1969. [15] From these figures, it is apparent that the GLLICO salary was highly significant to petitioner's financial well being. *474 Petitioner's income and anticipated gains from his salary arrangement with GLLICO were much more immediate than any potential investment reward. His employment contract of May 1, 1968, gave him, in substance, a 10-year contract right to a salary of $ 1,000 per month, and, as detailed in our findings, his salary would grow as the company's premium income increased. If the premium income had increased as he testified he hoped it would when the deal with First Texas was completed, his salary might have reached as much as $ 50,000 per annum. This salary increase would have been realized long before hs received any substantial benefit from the ownership of his GLLIC stock. By guaranteeing the Mansfield notes, petitioner apparently assumed that he was risking approximately $ 39,000 (one-third of the final judgment of $ 117,000 on the Mansfield notes). As an investment, his (and his family's) 10-percent stock interest in GLLICO did not approach that amount in terms of value. Petitioner testified in this case, as he did in connection with the receiver's suit, that his 18-percent interest in GLLICO in 1966 was worth approximately $ 9,000, based on a formula assigning a value of $ 25 *475 per $ 1,000 of insurance in force. There is no direct evidence of record as to the value of his investment at the time of the guaranties, but in light to all the evidence, including the June 30, 1970, Insurance Commissioner's report, we are confident that his investment in the company was at all relevant times worth much less than the amount of the risk he took in guaranteeing the Mansfield loans. In other words, as a matter of business judgment, the petitioner could not have justified guaranteeing the loans as a means of enhancing his stock investment in the company.
Respondent argues that the salary income was not particularly important to petitioner because he had foregone salary in the initial years of GLLICO and never collected the last 5 months of his $ 1,000 salary in 1970. While an important consideration, this fact is not decisive. [16] Unquestionably, petitioner contributed money to preserve the life of GLLICO. He may well have refused to draw further salary in 1970 in the ultimately vain hope that if GLLICO's resources were left intact as much as possible, it might squeak through the financial straits. His failure to draw his salary proves only that the Allens could *476 survive physically without the GLLICO salary. It does not prove that petitioner's guaranty was to preserve his investment in a company that had never paid a dividend, whose stock was nearly worthless and whose value had steadily declined, but which had paid him a salary of over $ 20,000 in the preceding two years and which ultimately might pay him substantially larger sums in the form of a salary. Based on the totality of the evidence, we find that petitioner's dominant motive in guaranteeing the Mansfield State Bank loans was to attempt to protect his job and his anticipated salary income. [17]
*477 3. Negligence
Section 6653(a) [18] imposes an addition to tax if any part of an underpayment of tax is due to negligence or intentional disregard of rules and regulations. Petitioner bears the burden of proving that respondent erred in determining additions to tax for 1974 and 1975. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure. We think that he has carried his burden. In the notice of deficiency, respondent determined adjustments totaling $ 22,085.73 in 1974 and $ 19,685.52 in 1975. The great bulk of these sums ($ 20,039.91 and $ 17,124) derives from three sources: the legal fees expense, the GLLICO bad debt deductions and certain allegedly unreported income. Petitioner *478 argues in effect that the negligence addition was probably imposed because of the substantial amount of the "adjustments" determined from these three sources. Because respondent has conceded much of the unreported income and because plausible explanations exist for the remaining amounts, we agree that the additions to tax were improperly imposed. Of course, no negligence can be attached to petitioner's GLLICO bad debt deduction which we have upheld. [19] We also think any attribution of negligence with respect to the legal fees' deduction is unwarranted. Petitioner presented at least plausible arguments on a controversial question of law and fact. That his legal interpretation was mistaken is not, we think, negligence within the meaning of section 6653(a). See Wofford v. Commissioner,5 T.C. 1152, 1166 (1945). *479 As for the remaining major item contributing to the deficiency, the unreported income, respondent has conceded substantial portions of the adjustments. There were some other minor mistakes in the returns. Petitioner impressed us as an honorable man proceeding in good faith, and we think that his honest mistake of fact in handling some of these minor items counters the charge of negligence; although good faith does not always negative negligence, we think petitioner used reasonable care in the preparation of his returns. See Wesley Heat Treating Co. v. Commissioner,30 T.C. 10, 26 (1958), affd. 267 F.2d 853 (7th Cir. 1959). Since petitioner's underpayment of tax thus seems almost entirely based upon honest misunderstandings of law and fact, we think that respondent erred in imposing an addition to tax for negligence or intentional disregard of rules and regulations. To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as in effect during the tax year in issue, unless otherwise noted.↩
2. The record does not include a copy of the 1970 return.↩
1. On brief, respondent calculated gross income as $ 24,367.54. He omitted three miscelllaneous items of income totaling $ 274.37.↩
3. SEC. 162. TRADE OR BUSINESS EXPENSES. (a) In General.--There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, * * * ↩
4. SEC. 212. EXPENSES FOR PRODUCTION OF INCOME. In the case of an individual, there shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year-- (2) for the management, conservation, or maintenance of property held for the production of income; ↩
5. The parties agree that the legal fees were related to business or profit seeking activities, see BHA Enterprises, Inc. v. Commissioner,74 T.C. 593, 597↩ (1980), but disagree whether they are capital in nature and so disallowed by sec. 263. 6. SEC. 263. CAPITAL EXPENDITURES. (a) General Rule.--No deduction shall be allowed for-- (1) Any amount paid out for new buildings or for permanent improvements or betterments made to increase the value of any property or estate. * * *↩
7. Petitioner's argument that Mrs. Allen's purpose in contributing the secured note to the insurance company is controlling misreads the applicable law. In United States v. Gilmore,372 U.S. 39 (1963) and Woodward v. Commissioner,397 U.S. 572, 576 (1970), the Supreme Court expressly disapproved the primary purpose test for most questions of litigation expenses, and in Woodward cast doubt on its utility for questions of defending or perfecting title. Later courts, including this one, have applied the origin and character test where ownership and title are more directly involved. See, e.g., Anchor Coupling Co. v. United States,427 F.2d 429 (7th Cir. 1970); Reed v. Commissioner,55 T.C. 32, 40↩ (1970).
8. GLLICO's May 4, 1966, resolution accepting the note specified that if GLLICO's assets were sold and the proceeds exceeded its debts, the note would be repaid. Nothing was said about a release. The Dodd transaction involved an exchange of 52 percent of GLLICO's stock for 48 percent of the holding company's stock. As no sale of corporate assets occurred, the resolution did not mandate a repayment or release of Mrs. Allen's note. ↩
9. The case of Tolzman v. Commissioner,T.C. Memo. 1981-689↩, does not aid petitioner's cause. In that case, this Court allowed as deductions certain legal fees incurred in a foreclosure action brought on guaranties related to the taxpayer's trade or business and property held for the production of income. The issue was whether the legal fees were personal in nature, not whether, as in the instant case, they should be capitalized.
10. SEC. 166. BAD DEBTS. (a) General Rule.-- (1) Wholly Worthless Debts.--There shall be allowed as a deduction any debt which becomes worthless within the taxable year. (d) Nonbusiness Debts.-- (1) General Rule.--In the case of a taxpayer other than a corporation-- (A) subsections (a) and (c) shall not apply to any nonbusiness debt; and (B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months. (2) Nonbusiness Debt Defined.--For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than-- (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.↩
11. The rules for determining whether a direct loan gives rise to a business or nonbusiness debt apply equally to debts which guarantors acquire by subrogation. Putnam v. Commissioner,352 U.S. 82 (1956); secs. 1.166-8 and 1.166-9, Income Tax Regs.↩
12. Respondent does not challenge the bona fides of the debts petitioner acquired by subrogation as a result of his discharge of the guaranties. See sec. 1.166-1(c), Income Tax Regs.↩ Nor does respondent argue that the debts' expected benefits were of a personal, not an investment oriented, nature.
13. For two of these loans, in the amounts of $ 7,000 and $ 6,870, the making and due dates listed in the report correspond to the dates appearing on the copied notes we have before us. Other $ 20,000 and $ 9,827.77 loans, however, were reported as made May 10, 1970, and due July 10, 1970, while the copied notes show making dates of July 10 and due dates of Sept. 8.↩
14. Adjusting petitioner's income to eliminate the GLLICO rental payments from the Ross Avenue building may not be appropriate in assessing petitioner's motives for two reasons. First, there is no evidence the building could not have been rented to some other tenant. Second the record contains very little evidence on petitioner's prospects for net rental income. There is no evidence of record to indicate that he anticipated in 1968, 1969, and early 1970 the ultimate loss of the Ross Avenue property in the litigation with GLLICO's receiver. ↩
15. Petitioner's tax liability on income from other sources was sufficiently meager during the pertinent years that an analysis of pre- and post-tax benefits of his GLLICO salary sheds no different light on petitioner's motives. Cf., United States v. Generes,405 U.S. 93, 104, 107-108↩ (1972).
16. See Carter v. Commissioner,T.C. Memo. 1979-447↩, where although the taxpayer did not receive a salary in the year he loaned money, this Court held that the debt was motivated by a desire to protect his employment and future salary rather than his investment.
17. Respondent also disallowed business bad debt deductions in the amounts of $ 1,000 for 1974 and $ 2,119.30 for 1975 in connection with payments as a guarantor of notes of Tecog Services Industries, Inc., claimed by petitioner. Petitioner offered no evidence to support the claimed deductions and in the absence of such evidence, respondent's disallowance must be sustained.↩
18. SEC. 6653. FAILURE TO PAY TAX. (a) Negligence or Intentional Disregard of Rules and Regulations with Respect to Income or Gift Taxes.--If any part of any underpayment (as defined in subsection (c)(1)) of any tax imposed by subtitle A * * * is due to negligence or intentional disregard of rules and regulations (but without intent to defraud), there shall be added to the tax an amount equal to 5 percent of the underpayment.↩
19. Petitioner also fully deducted as Tecog bad debts two payments (of $ 1,000 and $ 2,119.30), made as a guarantor. While petitioner now concedes that these are correctly nonbusiness bad debts (and not fully deductible), we note that the Tecog guaranteed payments were reported and deducted in the same manner as the GLLICO guaranteed payments. We do not think that petitioner's consistent treatment of the Tecog debts and the correctly deducted GLLICO debts rises to the level of negligence.↩