Audrey M. THOMPSON, Florence Ain & Gregory Ain, Dorothy E. Kahan & Robert Kahan, Nana Berman & William Berman, Petitioners–Appellants,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee.

Nos. 78–2579 to 78–2582.

United States Court of Appeals, Ninth Circuit.

Argued July 10, 1980.

Submitted July 31, 1980.

Decided Nov. 3, 1980.
Rehearing Denied Dec. 15, 1980.

Harry Margolis, Margolis, Chatzky, Dunnett & Muehlenbeck, P. C., Los Gatos, Cal., for petitioners–appellants.

Jonathan S. Cohen, San Francisco, Cal., for respondent–appellee.

Before CHOY and TANG, Circuit Judges, and REED,* District Judge.

TANG, Circuit Judge:

These three consolidated cases involve taxpayers who were partners and investors in a partnership and corporation that were

---

* Honorable Edward C. Reed, Jr., United States District Judge for the District of Nevada, sitting by designation.

involved in a series of transactions relating to the development of real property. These taxpayers appeal from adverse judgments of the Tax Court, which disallowed deductions taken by the taxpayers during three tax years, and which found that the transactions giving rise to the deductions lacked economic substance. The Tax Court's findings were not clearly erroneous, and we affirm its judgments.

The three cases here on appeal, in addition to a fourth that was resolved favorably to the taxpayers, were consolidated for hearing in the Tax Court because they all arose from the same complicated series of transactions. The named petitioner in each case represented many other petitioners who have agreed to be bound by the outcome of this litigation. The cases were largely tried upon stipulated facts. The Tax Court's extended and accurate compilation of the facts are recounted in its opinion, *Thompson v. Commissioner*, 66 T.C. 1024 (1976). For our purposes, it is necessary to detail only the most pertinent facts.

### A. The *Kahan* Case

Because of its relevance to later transactions, we include a brief summary of the facts of the unappealed *Kahan* case.

Robert Kahan is a certified public accountant engaged in a public accounting practice, who also promotes and organizes various real estate and business ventures. In 1965, he began discussing possible real estate transactions with Sunset International Petroleum Corporation (Sunset), a publicly-held corporation whose primary business activity was real estate development. Sunset was anxious to generate gains from real estate sales for financial reporting purposes, such gains being offset for tax purposes by loss carryforwards and deductions for depletion and intangible drilling costs relating to Sunset's petroleum business. At the same time, Sunset wanted to maintain a continuing interest in the future development of any undeveloped land that it sold.

As a consequence of these discussions, Kahan organized 18 individuals (15 of them his clients) as a limited partnership known as Del Cerro Associates (Del Cerro) to purchase a 112–acre section of Sunset's Del Cerro property in San Diego. One of the general partners was Ben Margolis, a lawyer and close friend of Kahan. Del Cerro paid Sunset $1,456,000 for the land by the delivery of two promissory notes. The notes provided for interest at an annual rate of 6%, payable monthly, but Del Cerro had the option, which it exercised, to prepay $350,000, the first 4 years' interest on the notes, and to defer the remaining interest until maturity of the notes. Del Cerro then entered an agreement with Lion Realty Corporation, a Sunset subsidiary, in which Lion was appointed exclusive agent with respect to the property, and, inter alia, was given the right to resell the land for no less than $2,250,000.

Del Cerro filed a tax return for the calendar year 1965 claiming a loss of $350,000 for the prepaid interest. The Commissioner disallowed the loss and the deductions taken by the partners for their share of the loss, claiming that the $350,000 was in effect a disguised loan to Sunset that would be repaid by the eventual repurchase of the property by Sunset from Lion Realty. Although skeptical, the Tax Court found that the taxpayers had established a prima facie case of their characterization of the transaction as a legitimate business venture because, even though the Del Cerro–Lion agreement was in effect a hidden option to Sunset, Sunset was not obligated to exercise the option. *Id.* at 1031, 1045–49. The Commissioner does not appeal this finding.

### B. The *Ain* Case

Harry Margolis, brother of Ben Margolis, is a tax attorney who has dealt with all of the taxpayers in these cases in a professional capacity. A. A. G. Smeets and W. M. J. Correa headed an organization (Smeets–Correa organization) of numerous entities, some of which provide trustee and corporate management services to trusts and corporations established in the Netherlands Antilles and the Bahamas. In 1963, the Smeets–Correa organization established a

trust company in the Bahamas known as Aruba Bonaire Curacao Trust Co. Ltd. (ABC). Until the spring of 1965 ABC was locally managed by, and shared office space with, a Bahamian bank. Thereafter, it acquired its own employees and office space although its officers and directors continued to be part of the Smeets–Correa Organization located in the Netherlands Antilles. Margolis and/or his associates represented numerous clients who established trusts placed with ABC.

In June 1965, ABC purchased for $750 an inactive corporation known as the Douglas N. McAvoy Organization (McAvoy), to be used as a shell in real estate transactions. ABC contributed in cash $650,000 of its own money to the capital of McAvoy.

In August 1965, McAvoy entered into a series of real estate agreements with Sunset. First, McAvoy agreed to purchase two parcels of commercial and multiresidential land in Thousand Oaks, California from Sunset for $700,000 to be paid by a promissory note, secured by the parcels, payable in full on September 1, 1975. The note provided for 10% annual interest. The first four years interest, $280,000, was due upon closing, with the remainder of the interest due upon maturity of the note in 1975. The two parcels were sold as part of a larger tract that was subject to existing first mortgages that could be released for about $550,000.

Second, McAvoy, as owner of the land, contracted with Sunset to arrange financing for the construction of a shopping center and apartments upon the two parcels. Upon execution of the agreement, McAvoy agreed to pay Sunset $370,000 as a fee for Sunset's arrangement of financing. McAvoy was responsible for paying interest on the financing.)

Third, McAvoy and Sunset also entered a joint venture agreement, by which the joint venture was to lease the Thousand Oaks parcels from McAvoy for the purpose of operating and managing them. As rent, the joint venture was required to pay all financing costs incurred by McAvoy, to make interest–free loans to McAvoy to cover the cost of the real property improvements, and otherwise to pay all costs associated with the property. The lease also granted the joint venture an option to purchase the property on or before August 1975. The option price ranged from $1,360,000 to $1,600,000, depending on the year in which it was exercised, plus assumption of existing mortgages. In order to retain the option, the joint venture was obligated to pay McAvoy $30,000 semi–annually, to be applied to the option price. The joint venture agreement also required Sunset to maintain and exercise the option. Sunset was also obligated to advance all other money required by the agreement for payment of rent or any other purpose and to bear all losses, but was granted broad power to manage, develop and sell the joint venture's leasehold interest. Any net cash receipts from the operation or sale of the property would be first applied to repay Sunset's loans and advances to the joint venture and any remaining balance would be divided equally between the two.

At the closing of the agreements, McAvoy paid in cash to Sunset the $280,000 "prepaid interest" and the $370,000 financing fee. Both amounts were capitalized on the books of McAvoy, which computed its income on the accrual method. The prepaid interest was amortized on a monthly basis over the four–year period; the financing fee was not amortized.

In late 1965, ABC, which then owned all the McAvoy stock, sold 98.53% of it to 30 individuals (the "McAvoy investors") at an aggregate price of $6,800,000, paid by individual unsecured promissory notes in favor of ABC in the full amount of the purchase price for the individual's portion of the stock. The notes bore 10% annual interest, with the first interest payment due by December 31, 1965. Payments on principal were deferred until maturity of the notes in 1972. The investors were primarily clients of Kahan and/or Margolis. ABC assigned the notes to World Minerals, a Netherlands Antilles corporation. Before December 31, 1965, the investors paid a total of $475,000 interest to World Minerals, most of the investors borrowing funds for that purpose

from Universal Decorating Leasing Company, whose counsel was Harry Margolis. Each investor deducted his payment of interest on his personal income tax returns for 1965, but the Commissioner disallowed the deductions. The Tax Court sustained the Commissioner.

## C. The *Thompson* Case

In 1966, the interests of 18 original partners of Del Cerro in the San Diego property and the interests of the 30 McAvoy investors in the Thousand Oaks property, were combined into a new Del Cerro Associates partnership (referred to as Del Cerro 1966). Six new investors became partners in this new partnership. Del Cerro 1966 dissolved McAvoy, with McAvoy's investors becoming partners of Del Cerro 1966 and McAvoy's interests in the Thousand Oaks property and the related agreements being transferred to Del Cerro 1966. In connection with this reorganization, arrangements were made for the cancellation of the individual notes totalling $6,800,000 held by World Minerals, and the assumption of the aggregate obligation by Del Cerro 1966. In addition, the prepaid financing fee of $370,000 and the unamortized prepaid interest of $245,000 that had been carried as assets on the books of McAvoy were carried forward on the books of Del Cerro 1966, and McAvoy's investment in the Thousand Oaks property, which had been included in the assets of McAvoy at no more than $715,000 was written up on the books of Del Cerro 1966 as an asset called "Contractual Rights and Interests" in the amount of $6,254,500. An additional $1,065,000 in capital was contributed by the Del Cerro 1966 partners to the partnership, mostly with funds borrowed for that purpose from three corporations in which Harry Margolis had either an ownership interest or a working relationship.

In its partnership tax return for 1966, Del Cerro claimed an interest deduction of $1,070,000, consisting of (1) $825,000 paid to World Minerals as interest on the $6,800,000 obligation assumed by the McAvoy investors, and (2) $245,000 representing a complete writeoff of the prepaid interest taken over by Del Cerro 1966 from the books of McAvoy. The partnership loss was allocated among the partners according to their respective 1966 cash capital contributions to the partnership. The Commissioner disallowed the resulting deductions taken by the partners on their personal returns, and the Tax Court upheld the Commissioner.

## D. The *Berman* Case

During 1967, Sunset began experiencing financial difficulties, including a default on its agreement with Del Cerro, and began negotiations with creditors, including Del Cerro. The arrangements between Sunset and Del Cerro, relating to both the San Diego and Thousand Oaks properties were substantially revised. As a result of these revisions, the purchase money notes due from Del Cerro to Sunset with respect to the San Diego property remained in effect but without "personal" liability; Sunset was required to pay Del Cerro $1,200,000 in cash before January 15, 1968, or, at Sunset's option, deliver Del Cerro 110,000 shares of Commonwealth United Corporation stock at a price no less than $12 a share; the obligations of the parties in connection with the development of the properties were cancelled, and the notes totalling $1,450,000 from Del Cerro to Sunset in connection with the San Diego property in effect became Sunset's collateral for performance of its new obligations to Del Cerro, meaning that failure by Sunset to perform would entitle Del Cerro to cancel the notes and reclaim the property.

Later in 1967, Del Cerro modified the terms of its $6,800,000 obligation to World Minerals that Del Cerro had assumed from the McAvoy investors. The effect of this modification was that Del Cerro would transfer to World Minerals some of its assets, including its interest in the San Diego property and the money or stock received under the revised Del Cerro–Sunset agreement, to be credited toward the $6,800,000 it owed World Minerals.

During 1967, 48 of the 54 Del Cerro partners contributed additional amounts to the

capital of the partnership, totalling $1,178,-317.

In its partnership tax return for that year, Del Cerro reported a net loss of $4,543,035, most of which arose from a write off of $6,254,500 in intangible assets attributed to the termination of the agreement with Sunset to develop the Thousand Oaks property. The Commissioner disallowed the resulting partnership losses taken by the individual partners on their personal tax returns. *Id.* at 1044–45. This ruling was sustained by the Tax Court.

## II.

### Analysis

■ The Tax Court disallowed the deductions taken by the petitioners in these cases because it found that the transactions creating their asserted losses lacked economic substance. "Sham" transactions, having no economic effect other than the creation of income tax losses, cannot be recognized for tax purposes. *Knetsch v. United States*, 364 U.S. 361, 81 S.Ct. 132, 5 L.Ed.2d 128 (1960).

This court will not disturb the fact findings of the Tax Court unless they are clearly erroneous. *Geneva Drive In Theater, Inc. v. Commissioner*, 622 F.2d 995 at 996 (9th Cir. 1980); *First Security Bank of Idaho v. Commissioner*, 592 F.2d 1050, 1053 (9th Cir. 1979). Less clear is the appropriate standard of review where a "mixed" question of fact and law is present. *Compare Lundgren v. Commissioner*, 376 F.2d 623, 627 (9th Cir. 1967) (mixed question subject to "review") *with Parkside, Inc. v. Commissioner*, 571 F.2d 1092, 1095 n.5 (9th Cir. 1977) (Pregerson, J., concurring specially) (clearly erroneous standard of review applies to questions of fact "even where arguably" mixed with law).

■ We need not resolve this possible conflict here, however, because we find that the Tax Court's determination whether a transaction is lacking in economic substance is essentially a factual determination, and therefore, subject to the clearly erroneous standard of review. *Weisbart v. Commis-*

*sioner*, 564 F.2d 34, 36 (10th Cir. 1978). This is because the Tax Court's inquiry is not directed toward the application of a statute or an express legal standard. Instead, it requires the Tax Court to focus on the facts and circumstances of particular transactions and resolve whether, as a practical matter, those transactions have any economic impact outside the creation of tax deductions. Enmeshed as it is in factual considerations, the conclusion reached by the Tax Court will spring more from its experience "with the mainsprings of human conduct" rather than the application of any legalistic formula, and makes appropriate a narrow standard of review. *See Commissioner v. Duberstein*, 363 U.S. 278, 289–91, 80 S.Ct. 1190, 1198–1200, 4 L.Ed.2d 1218 (1960). The expertise that the Tax Court brings to bear in its consideration of these complex factual situations provides, of course, further reason to defer to its conclusion. *See Sibla v. Commissioner*, 611 F.2d 1260, 1262 (9th Cir. 1980).

■ The taxpayers argue, in effect, that they are entitled to de novo review because the facts in the Tax Court were largely stipulated and the cases turn on the resolution of conflicting inferences to be drawn from the facts. To the extent that the tax court's findings are predicated upon inferences drawn from documents and undisputed facts, however, the clearly erroneous standard of review remains applicable. *See United States v. United States Gypsum Co.*, 333 U.S. 364, 394–95, 68 S.Ct. 525, 541–542, 92 L.Ed. 746 (1948); *Geneva Drive In Theater, Inc.*, at 996.

We conclude that the findings of the Tax Court are not clearly erroneous.

### A. The *Ain* Case

Despite the complex and intricate nature of many of the transactions in this case, the Tax Court's decision to disallow the deductions taken by the taxpayers generally centered on the rather narrow circumstances surrounding the resale of 98.53% of the McAvoy stock by ABC to the 30 McAvoy investors. The Tax Court reasoned:

In 1965, all of the stock of McAvoy, then a corporate shell, was acquired by ABC for $750. ABC subsequently contributed an additional $650,000 to the capital of McAvoy, for a total investment of $650,750. In late August 1965, the Thousand Oaks property was sold by Sunset to McAvoy for $700,000 in the form of a purchase–money mortgage. McAvoy paid Sunset an additional $280,000 in prepaid interest and $370,000 as a financing fee, which amounts were capitalized. Thus, McAvoy held assets with a book cost of $1,350,000, subject to a long–term mortgage of $700,000. *Within 3 months* after these transactions with Sunset, ABC resold 98.583 percent of its McAvoy stock to the 30 McAvoy investors for $6,800,000, *more than 10 times its cash investment in such stock and more than 10 times the stock's book value.* Under the circumstances, the bona fides of such an arrangement are suspect on their face; a purchase and resale within 3 months at a tenfold increase in price strains reasonable credulity.

*Thompson*, 66 T.C. at 1051 (emphasis in original).

We too find the $6,800,000 sale inexplicable. The taxpayers argue that their purchase of McAvoy for $6,800,000 from ABC was not a sham because the real estate development for which McAvoy (then owned by ABC) and Sunset had contracted was worth nearly that much. They point to the general existence of factors (leverage, zoning, financing, labor and material costs, and marketability) that, hypothetically, could radically transform the value of the Thousand Oaks land. There is nothing in the record, however, to show that any of these factors actually operated in the months between McAvoy's purchase of the land and the sale of McAvoy to the McAvoy investors to increase the value of the land from the $700,000 paid by McAvoy to the $6,800,000 paid to ABC by the McAvoy investors for McAvoy three months later.

There are numerous reasons to believe that McAvoy was not nearly worth what the investors paid for it. Although the taxpayers point to the Sunset–McAvoy development arrangements as creating valuable rights far beyond the value of the Thousand Oaks property itself, in fact whatever additional value that accrued by reason of those arrangements must have existed at the time McAvoy purchased the land from Sunset, since both the land sale and the development agreements were part of the same set of transactions. Presumably, any enhanced value of the land resulting from the associated agreements would have been included in the sales price.

The Tax Court found it incredulous that Kahan and Harry Margolis, who were both familiar with Sunset's efforts to sell its property, would advise the McAvoy investors to purchase McAvoy from ABC for $6,800,000 when they knew that the McAvoy investors could have acquired the same assets directly from Sunset and entered the same agreements for $700,000 only three months earlier. Although this fact alone justifies suspicion about the bona fide nature of the transactions, virtually dispositive is the fact that Sunset, through the joint venture, retained an option, which it was obliged to exercise, to repurchase the land for no more than $1,600,000. It is difficult to understand why investors would purchase land and associated development rights for $6,800,000 when those assets could be repurchased from them at any time for considerably less.

The Tax Court's explanation why the McAvoy investors may have entered this arrangement was that ABC may have been intentionally interpositioned between Sunset and the McAvoy from the outset in order artificially to create tax deductions. Although not necessary to sustain its decision, the inference was quite reasonable. With the possible exception of Sunset, the entities involved in these transactions were interrelated either through ownership or their association with Harry Margolis or Kahan. In particular, Margolis' connections with both the McAvoy investors and ABC, a small trust company funded by an unknown trust, strongly suggests that the intermediary role of ABC was purely artificial.

Given all of the above, the Tax Court was not required to credit the testimony of Kahan that the property would bring the McAvoy investors a profit of $10,000,000. See *Potts, Davis & Co. v. Commissioner*, 431 F.2d 1222, 1225–26 (9th Cir. 1970).[1]

## B. The *Thompson* Case

In *Thompson*, the Tax Court disallowed both the deductions of the $825,000 paid to World Minerals as interest on the $6,800,000 in notes assumed by Del Cerro 1966 and the $245,000 representing a write off of the prepaid interest account taken over by Del Cerro 1966 from the books of McAvoy.

The taxpayers present no argument in their brief to suggest that the $245,000 was incorrectly disallowed, and in fact, conceded in their motion for reconsideration that the Tax Court was correct in disallowing this deduction. In any event, the Tax Court's disposition of this item was correct because a cash basis taxpayer, like Del Cerro 1966, may deduct accrued interest only in the year paid, 26 C.F.R. § 1.461–1(a), and the $245,000 interest was not paid by Del Cerro in 1966 but in 1965 by McAvoy.

With regard to the $825,000, it must be treated the same as the $475,000 interest claimed in the prior year by the *Ain* taxpayers. In the *Ain* case, the $475,000 was interest paid to World Minerals in 1965 by the McAvoy investors that was due on the $6,800,000 in individual notes given by the McAvoy investors. In *Thompson*, the $825,000 was interest on the same notes paid to World Minerals in 1966 by the Del Cerro 1966 partnership, which had assumed in full the notes of the McAvoy investors after the

merger of the McAvoy investors and the 18 original Del Cerro partners.[2]

## C. The *Berman* Case

In this case, the Tax Court disallowed the loss of $4,543,035 taken by the Del Cerro partnership in 1967 because it would not permit Del Cerro to write off $6,254,500 as a loss of contractual rights upon its termination of the development agreement with Sunset. Again, the analysis in *Ain* is controlling.

Under § 165 of the Internal Revenue Code, a loss deduction is allowed for the sudden termination of usefulness of property in a transaction entered for a profit, but the amount of the deduction allowable is limited to the tax basis of the property in question. The Tax Court found that, at the time the Thousand Oaks property was acquired by McAvoy from Sunset and the development agreements executed, McAvoy recorded on its books the cost of the land ($700,000) but not any "contractual rights and interests." These rights were not (and could not be) separately recorded with their own cost basis because they did not have any cost to McAvoy. Nevertheless, when McAvoy was dissolved into Del Cerro 1966, Del Cerro 1966 recorded $6,254,500[3] in "contractual rights and interests" as a separate asset received from McAvoy. The court found no justification for this evaluation in light of its earlier analysis in *Ain* that the $6,800,000 purchase of the McAvoy stock was a sham.

Because, as we decided in *Ain* and *Thompson*, the taxpayers failed to justify their purchase for $6,800,000 of property

---

1. One of the few factual findings genuinely disputed by the taxpayers is the Tax Court's statement that, at the time the development arrangements with Sunset were entered, "Sunset's ability to perform must have been at least questionable." *Thompson*, 66 T.C. at 1051. The taxpayers point to evidence suggesting that Sunset was financially sound at the time. This factual dispute, however, is not material. The Tax Court did not rely on Sunset's financial health in drawing its conclusion. Nor is Sunset's financial picture relevant, since it is the ABC sale of McAvoy to the McAvoy investors, not the original Sunset–McAvoy transactions, that is the primary subject of this controversy.

2. The taxpayers provide no explanation why the taxpayers paid $475,000 in interest on the $6,800,000 notes in 1965 and $825,000 on the same principal at the same rate of interest in 1966. The Government suggests that this erratic repayment schedule demonstrates that the taxpayers were claiming losses in the years that it would do them the most good.

3. The taxpayers do not explain how they computed the $6,254,500 sum.

worth only $700,000 three months earlier, it follows that the Del Cerro write–up of contractual rights, based on the same overvaluation of Thousand Oaks property and associated agreements, also had no basis. The taxpayers insist, however, that the contractual rights and interests had a tax basis. In a liquidation, the tax basis of the property received by the distributee (here Del Cerro 1966) equals the fair market value of the property. 26 U.S.C. § 334(a). The taxpayers argue that the only evidence of the fair market value of the McAvoy assets was the amount they actually paid for them, i. e., the $6,800,000 paid by the McAvoy investors to ABC, and, later, the assumption of $6,800,000 in notes by Del Cerro 1966 in exchange for the McAvoy assets. Although the amount paid for assets in an arm's length transaction might be evidence of their fair market value, the taxpayers' argument ignores the central finding of the Tax Court that the assets here simply did not have the value that the taxpayers ascribed to them.

The taxpayers also argue that their basis in the partnership should be increased by their intermittent cash contributions of capital to the partnership. This argument misses the point. Partnership income or loss is determined at the partnership level and not at the level of the individual partners. The distributive share of income or loss of the individual partners can be determined only by reference to the income or loss of the partnership itself. See 26 U.S.C. §§ 701–704; *United States v. Basye*, 410 U.S. 441, 93 S.Ct. 1080, 35 L.Ed.2d 412 (1973). Here, the taxpayers failed to show that the partnership itself had a tax basis in the contractual rights through which they could claim their distributive share.

In their reply brief, the taxpayers raise the issue of collateral estoppel through the citation of two cases decided after their opening brief was filed, *Parklane Hosiery, Inc. v. Shore*, 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979), and *Starker v. United States*, 602 F.2d 1341 (9th Cir. 1979). They argue that the Tax Court's unappealed decision against the Commissioner in *Kahan* should be considered the "first case" and have collateral estoppel effect in "the second litigation," the *Ain, Thompson,* and *Berman* cases.

Even though *Parklane* and *Starker* were intervening cases, the doctrine of collateral estoppel itself is hardly new. The general rule is that appellants cannot raise a new issue for the first time in their reply briefs. *See United States v. Puchi*, 441 F.2d 697, 703 (9th Cir.), *cert. denied*, 404 U.S. 853, 92 S.Ct. 92, 30 L.Ed.2d 92 (1971). Even were we to review this issue, we would reject it. In *Starker*, the court held that the Government was collaterally estopped from relitigating the taxpayer's right to a tax refund where it had earlier lost its case against the taxpayer's son that was based on the same contract involved in the taxpayer's case. The *Kahan* case was litigated on the basis of significantly different facts than "the second litigation." Most conspicuously, the fact most damaging to the taxpayers here—the inflated resale of the McAvoy stock—is not present in the *Kahan* transactions.

The judgment of the Tax Court is affirmed.