MICHAEL M. GURDIN AND MARLENE GURDIN, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Gurdin v. Commissioner
Docket Nos. 3851-74; 5661-74; 5662-74; 7199-75; 7202-75; 7203-75; 6248-77; 7229-77; 11463-77; 14470-80; 14472-80; 15477-80; 11329-81; 13282-81; 35702-85.
United States Tax Court
T.C. Memo 1988-31; 1988 Tax Ct. Memo LEXIS 31; 54 T.C.M. (CCH) 1609; T.C.M. (RIA) 88031; January 27, 1988. Louis E. Goebel, for the petitioners. Charlotte Mitchell, for the respondent. GOFFE
MEMORANDUM FINDINGS OF FACT AND OPINION GOFFE, Judge: These consolidated cases were assigned to Special Trial Judge Hu S. Vandervort pursuant to section 7456(d)(3) of the Code (redesignated section 7443A(b)(3) by section 1556 of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2755) and Rule 180 et seq. of the Tax Court Rules of Practice and Procedure.[2] The Court agrees *32 with and adopts the opinion of the Special Trial Judge, which is set forth below. OPINION OF THE SPECIAL TRIAL JUDGE VANDERVORT, Special Trial Judge: Respondent determined deficiencies in petitioners' Federal income taxes and additions to tax for the years and in the amounts as follows: Additions
Deficiency
to Tax
in Income
Under Sec.
Petitioners
Docket No.
Tax Year
Tax
6653(a)
Gurdin
3851-74
1971
$  52,421.00
2,621.00
7202-75
1972
38,157.00
1,908.00
7229-77
1973
304,229.00
15,211.00
35702-85
1974
59,950.00
-
35702-85
1975
22,765.00
-
14472-80
1976
110,184.00
-
11329-81
1977
16,233.00
-
13282-81
1978
287,479.00
-
Sievers
5661-74
1971
35,915.00
-
7203-75
1972
24,565.00
1,228.00
7229-77
1973
304,229.00
-
14472-80
1976
201,699.00
-
Zeiler
5662-74
1971
25,479.00
1,274.00
7199-75
1972
12,366.00
618.00
11463-77
1973
588,062.00
29,403.00
15477-80
1976
356,425.00
-
*33 Petitioners claim deductions arising from the transactions undertaken by the GMSZ Partnership (GMSZ) in acquiring both the Fox Shopping Center and a later interest in a Sears lease. The principal issues for determination are: A. Whether the Commissioner's notice of deficiency is arbitrary so as to shift the burden of going forward with the evidence to respondent. B. Whether res judicata or collateral estoppel precludes respondent from contesting certain issues which appear in Hill v. Commissioner,63 T.C. 225 (1974), affd. without published opinion 551 F.2d 313 (9th Cir. 1977). C. Whether the purchase and sale of the Fox Shopping Center by the GMSZ Partnership had substance and economic purpose beyond the tax benefits claimed. D. Whether petitioners incurred bona fide indebtedness which will allow an interest deduction. E. Whether the acquisition of an interest in a Sears lease was a bona fide transaction. F. Whether these cases warrant additions to tax under section 6653(a). FINDINGS OF FACT Certain facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this *34 reference. Each of the petitioners resided in California when they filed their petitions in this case. These cases arise out of the petitioners' investment and interest in a California general partnership commonly known as the GMSZ Partnership (GMSZ). GMSZ was formed on or about December 15, 1971, by four medical doctors whose initials comprise the name of the partnership; namely, Dr. Michael M. Gurdin, Dr. Phillip Marcus, Dr. Jerome J. Sievers, and Dr. Meyer Zeiler. Harry Margolis (Margolis) was an attorney in California who specialized in tax planning. He and others employed by his law office organized the GMSZ Partnership. He also provided legal and accounting services and arranged financing for GMSZ. Margolis employed a number of foreign and domestic entities, called "system entities," for tax planning. These system entities included Aruba Bonaire Curacao Trust Co., Ltd. (ABC), Bonaire Development Co., World Minerals, N.V., Anglo Dutch Capital Co., California Care Corporation, and Antiqua Banking, Ltd.
Simon Lazarus was the original owner of the Fox Shopping Center, consisting of land and improvements located in Los Angeles County, California. In April, 1964, *35 Branjon, Inc., a California corporation, purchased the shopping center land and related leasehold interests and improvements. On August 1, 1964, Branjon, Inc. joined Simon Lazarus in refinancing Lazarus' outstanding first deed of trust to Connecticut General Life Insurance Co. With the Fox property as security, the two parties cosigned a note in the amount of $ 650,000. The note was for 20 years, with annual payments of $ 4,660.50, the balance being due November 1, 1984. In 1965, Lazarus paid off his indebtedness secured by second and third deeds of trust on the Fox property. On August 19, 1964, Branjon, Inc. conveyed the shopping center buildings, along with their accompanying leases to a group of seven individuals and one corporation. The stated purchase price price for the sale was $ 2,368,699.50. Pursuant to a modification of the purchase agreement, this amount was reduced to $ 2,306,365 in February, 1965. On August 19, 1964, Branjon, Inc. conveyed the land on which the shopping center was located to a partnership of seven partners, at a stated price of $ 549,575. Branjon, Inc. retained record ownership of the land. On December 28, 1967, Branjon and Lazarus entered *36 into an agreement in which Branjon agreed to assume liability for Lazarus' $ 672,999.98 first deed of trust to Connecticut General which was secured by the Fox property. In return, Lazarus executed a negotiable promissory note to Branjon for $ 672,000 at 6-percent interest, payable on January 1, 1977. Lazarus further guaranteed to Branjon that rental from the Fox property would equal $ 2,000 per year for the following 10 years. As security for the obligation, Lazarus pledged a $ 705,000 note he received from Las Posas Development Co. in a land sale -- a note upon which Lazarus could make full demand for payment at any time prior to June 15, 1968. Although Benjon assumed the liabilities of Lazarus, the parties feared that such assumption, if brought to the attention of Connecticut General, might trigger a demand for full payment of the Lazarus indebtedness. Thus, it was agreed that Lazarus would continue to make the actual payments on the outstanding first deed of trust to Connecticut General, but would be reimbursed for such payments by Branjon. Lazarus made all required payments on the indebtedness, and the outstanding amount of such indebtedness in 1972 was $ 500,000. *37 On January 31, 1968, the shopping center improvements were sold back to Branjon, Inc. In April, 1969, Branjon, Inc. merged into an entity named Pacific Lenders, Inc., a California corporation. At or about the same time, Pacific Lenders, Inc. changed its name to Bonaire Development Co., a California corporation soley owned by ABC. In June, 1971, Bonaire Development Co. adopted a plan of complete liquidation and dissolution. By way of Corporation Grant Deed, bearing the date December 30, 1971, Bonaire Development Co. purported to convey title to the shopping center land to Continental Title Co., which was to hold title for the benefit of ABC pursuant to a "Holding Agreement". The signatures of each of the petitioners, and that of Philip Marcus, appear on signature pages attached to a document called "Partnership Agreement". The Partnership Agreement recites that on December 15, 1971, the GMSZ partnership was formed for the purpose of acquiring and operating the Fox Shopping Center. The signatures of the GMSZ partners, and that of the vice-president of ABC, appear on a document entitled "Agreement For The Sale of Shopping Center," wherein it is recited that the GMSZ Partnership *38 purchased the Fox Shopping Center land and improvements from ABC on December 31, 1971 for a purchase price of $ 2 million. The document also recites that the $ 2 million was to be paid by an unsecured promissory note from GMSZ, bearing annual interest of 10 percent and that the first full year's interest of $ 200,000 was to be paid by GMSZ on December 31, 1971. On its tax returns for 1971, 1972, and 1973, the GMSZ Partnership allocated the $ 2 million purchase price as follows: $ 450,000 to the shopping center land, and $ 1,550,000 to the improvements for depreciation purposes. The signatures of the GMSZ partners appear on a document entitled "Negotiable Promissory Note," bearing the date December 31, 1971, with the face amount of $ 2 million in favor of ABC. The signatures of petitioners also appear on promissory notes, each bearing the date December 30, 1971, with the face amount of $ 50,000, in favor of Anglo Dutch Capital Co. The signatures of the GMSZ partners appear, together with those of Harry Margolis, President, Anglo Dutch Capital Co., and M. D. Jobin, Vice President, ABC, on a document entitled "Loan Assumption Agreement," bearing the date December 19, 1972. *39 The signatures of the GMSZ partners appear on a document entitled "Non-Negotiable Promissory Note," bearing the date December, 1972, with the face amount of $ 100,000 in favor of ABC. The signature of Meyer Zeiler, M.D., appears on a check written to the order of Anglo Dutch Capital Co., in the amount of $ 99,800.17, and bearing the date February 6, 1973, and the notation "Loan Repayment." Zeiler obtained a number of loans from Anglo Dutch Capital Co. and it is uncertain exactly how many of those prior loans were covered by the check for $ 99,800.17. Meyer Zeiler's signature appears on a document entitled "Agreement For the Sale of Partial Leasehold Interest," bearing the date March 28, 1973, along with the signature of Michael G. Chatsky (Chatsky), President, California Care Corporation. California Care Corporation was at all relevant times a California corporation. Chatsky was an attorney in the law offices of Margolis, Chatsky & Dunnett, and was the president of California Care Corporation during the period 1971 through 1978. The signatures of the GMSZ partners appear on a document entitled "Agreement For the Sale of Shopping Center," bearing both the date March 31, 1973, and *40 the signature of Robert L. Dunnett, President, Loboma Corporation. Dunnett was an attorney in the law offices of Margolis, Chatsky & Dunnett. The Loboma Corporation was at all relevant times a California corporation with Simon Lazarus as President. Meyer Zeiler's signature appears on a document entitled "Agreement," bearing the date March 4, 1974. Zeiler contributed his interest in the Sears Leasehold to the GMSZ Partnership in order to spread some of his liability under the lease to the partnership, and to increase his interest in the GMSZ Partnership. The signatures of the GMSZ partners appear on a document entitled "Assignment of Claim," bearing the date April 1, 1974, along with the signature of Harry Margolis, President, Anglo Dutch Capital Company. A letter, dated May 31, 1974, sent from ABC to Simon Lazarus, President, Loboma Corporation, contained the following statement in the last paragraph: "We are pleased to be able to instruct you that your records should capitalize the sum of Two Million Fifty Thousand Dollars ($ 2,050,000.00) as contributed capital from shareholder." A document entitled "Agreement For the Purchase and Sale of Partnership Interest," dated *41 December 31, 1976, bears the signatures of the GMSZ partners along with that of Michael G. Chatsky, President, California Care Corporation, and reflects the sale by Jerome J. Sievers of his 25 percent partnership interest in GMSZ to California Care Corporation. A document entitled "Agreement for the Purchase and Sale of Partnership Interest," bears the date December 31, 1976 and bears the signature of the GMSZ partners along with that of Michael G. Chatsky, President, California Care Corporation. It purportedly reflects the sale by Meyer Zeiler of his 25 percent partnership interest in GMSZ to California Care Corporation. A document entitled "Agreement for the Purchase and Sale of Partnership Interest," bears the date November 30, 1978 and purportedly bears the signature of Michael M. Gurdin and Michael G. Chatsky, President, California Care Corporation. It purportedly reflects the sale by Michael M. Gurdin of his 25 percent partnership interest in GMSZ to California Care Corporation. OPINION Petitioners argue that respondent's determination is arbitrary and that the information used by respondent in reconstructing the transaction was insufficient to establish the correctness *42 of the deficiency, thereby shifting the burden of going forward with the evidence to respondent. Petitioners argue in the alternative that, even if the burden of going forward with the evidence is not shifted, they have met that burden. Respondent argues that the statutory notice of deficiency is entitled to the ordinary presumption of correctness. Further, respondent argues that petitioners' evidence lacks sufficient credibility to show that the transactions were anything other than documented "money movements", shams having no economic substance and producing no actual, deductible expenses. After reviewing the entire record, it is the judgment of this Court that: A. Petitioners have the burden to prove the substance of the transactions. The Commissioner's notice of deficiency is not arbitrary. B. Res judicata and collateral estoppel do not preclude respondent from contesting the substance of the transactions at issue in these cases. C. The purported sale transaction and acquisition of the Fox Shopping Center was in substance devoid of economic viability and a sham designed solely for tax purposes. D. The GMSZ Partnership did not incur valid indebtedness and *43 is not entitled to the interest deduction. E. The acquisition of an interest in the Sears lease was a sham designed for tax benefits only. F. Petitioners are liable for additions to tax under section 6653(a).
A. Notices of Deficiency
Petitioners argue that the notices of deficiency issued by respondent in these cases are arbitrary. A notice of deficiency ordinarily carries with it a presumption of correctness that places the burden of proof and the burden of going forward with the evidence on the petitioner. Rule 142(a); Welch v. Helvering,290 U.S. 111 (1933); Llorente v. Commissioner,74 T.C. 260 (1980), revd. in part 649 F.2d 152 (2d Cir. 1981); Greenberg's Express, Inc. v. Commissioner,62 T.C. 324, 327 (1974). However, a showing by petitioner that the notice is arbitrary or without foundation has the effect of shifting the burden of going forward with the evidence to respondent. Helvering v. Taylor,293 U.S. 507 (1935); Weimerskirch v. Commissioner,596 F.2d 358 (9th Cir. 1979). *44 In asking for a finding that the notice of deficiency is arbitrary, petitioner is asking this Court to explore the underpinnings of that notice. Dellacroce v. Commissioner,83 T.C. 269, 280 (1984); Riland v. Commissioner,79 T.C. 185, 201 (1982). As a general rule, this Court will not look behind the statutory notice to examine the evidence used in making such a determination. Riland v. Commissioner, supra at 201. However, if a taxpayer can show that a deficiency determination of unreported illegal income is totally unsubstantiated or is based entirely on hearsay evidence, then the determination will be deemed arbitrary. Dellacroce v. Commissioner, supra at 284. For instance, in Weimerskirch v. Commissioner, supra, no evidence was offered to substantiate a deficiency determination of unreported illegal income. The Ninth Circuit held that, since there was no more than a naked assessment without any evidentiary foundation, the Commissioner was not entitled to a presumption of the correctness of the *45 deficiency determination. See Weimerskirch v. Commissioner, supra.
While petitioners rely on Weimerskirch, it is a limited exception to the general rule that the Commissioner's determinations are presumptively valid. Karme v. Commissioner,673 F.2d 1062, 1065 (9th Cir. 1982), affg. 73 T.C. 1163 (1980). When there is an unsubstantiated determination of unreported illegal income, the burden of going forward shifts to respondent "because the taxpayer may face practical difficulties in attempting to refute the Commissioner's assertion that the taxpayer received unreported income." Karme v. Commissioner, supra: Rockwell v. Commissioner,512 F.2d 882, 886 (9th Cir.), cert. denied 423 U.S. 1015 (1975). That problem does not exist in this case since the Commissioner has sufficient evidence to question the deductions. These cases do not involve determinations of unreported illegal income, but instead, disallowances of deductions claimed on petitioners' income tax returns. The record shows that the Commissioner's deficiency determination was by no means naked. Unlike Weimerskirch, respondent has *46 offered substantial evidence calling petitioners' deductions into question and petitioners retain the burden of going forward as well as the burden of proof. Thompson v. Commissioner,631 F.2d 642, 646 (9th Cir. 1980), cert. denied 452 U.S. 961 (1981); Herbert v. Commissioner,377 F.2d 65, 71 (9th Cir. 1966). Voluminous records were stipulated into evidence with the reservation that this Court would decide their significance. To meet their burden, petitioners have to do more than simply offer these documents, which recite that the transactions were undertaken under certain terms and circumstances, without proving their substance. See Llorente v. Commissioner, supra.
Petitioners must produce enough evidence to support a finding contrary to the Commissioner's determination and show the merits of their claim by a preponderance of the evidence. Rockwell v. Commissioner, supra. The evidence must reveal that the transactions were bona fide, meaning they were undertaken at arm's length and that terms were negotiated and prices bargained for. Rockwell v. Commissioner, supra.
*47 B. Res Judicata -- Collateral Estoppel
The taxpayers in Hill v. Commissioner,63 T.C. 225 (1974), affd. without published opinion 551 F.2d 313 (9th Cir. 1977), successfully disputed the Commissioner's determination regarding the sale and ownership of the Fox Shopping Center, the same property that is involved in the present dispute. In the opinion, this Court stated, "The GMSZ partnership * * * purchased the Fox property on December 31, 1971, giving a note to the seller for $ 2 million * * *" Hill v. Commissioner, supra at 241. It must be noted that this was a statement not related to the central issue of the case nor an issue that the parties litigated. In addition, petitioners in the present cases are not the same or in privity with the taxpayers in Hill.
Petitioners in the present case propose that this Court apply the statement in Hill to refute respondent's contentions that GMSZ never owned the shopping center and that there was no substance to the partnership's transactions. Presumably, they argue that the doctrine of res judicata or collateral estoppel applies to the statement. We take judicial notice that *48 Hill provides an historical background for the instant case. See Perkins v. Commissioner,36 T.C. 313 (1961). However, neither res judicata nor collateral estoppel binds that case to the validity of the GMSZ Partnership transactions in the present cases. See United States v. Mendoza,464 U.S. 154 (1984). The general principle of res judicata and collateral estoppel is that a right, question, or fact distinctly put in issue and directly determined by a court of competent jurisdiction, as a ground of recovery, cannot be disputed in a subsequent suit between the same parties or their privies. See United States v. Moser,266 U.S. 236 (1924). Even if the second suit is for a different cause of action, the right, question or fact once so determined must, between the same parties or their privies, be taken as conclusively established, so long as the judgment in the first suit remains unmodified. See United States v. Moser, supra.
The Supreme Court stated in Montana v. United States,440 U.S. 147, 153-154 (1979): *49 To preclude parties from contesting matters that they have had a full and fair opportunity to litigate protects their adversaries from the expense and vexation attending multiple lawsuits, conserves judicial resources, and fosters reliance on judicial action by minimizing the possibility of inconsistent decisions.
Under Federal income tax law, both res judicata and collateral estoppel are applicable in proper instances. See Commissioner v. Sunnen,333 U.S. 591 (1948); Tait v. Western Maryland Railway Co.,289 U.S. 620 (1933). The doctrines are important in tax law mainly because they limit repeated litigation between taxpayers and the IRS.
The doctrine of res judicata applies to repetitious suits involving the same cause of action. See Cromwell v. County of Sac,94 U.S. 351 (1877). It provides that where a court has entered judgment in an action, the parties to that action are bound not only as to every matter which was offered and received *50 to sustain or defeat the claim or demand, but also as to any other admissible matter which might have been offered for that purpose. See Cromwell v. County of Sac, supra.
With respect to income tax litigation, each year is the origin of a new liability and of a separate cause of action. See Commissioner v. Sunnen, supra;Estate of Hunt v. United States,309 F.2d 146 (5th Cir. 1962). Accordingly, a court's judgment is conclusive only with respect to the cause of action which gave rise to that judgment and is in no way conclusive with respect to a subsequent and separate cause of action unless the doctrine of collateral estoppel is properly applicable. See Commissioner v. Sunnen, supra.
The doctrine of collateral estoppel precludes relitigation of any issue of fact or law that is actually litigated and necessarily determined by a valid and final judgment. See Wright v. Commissioner,84 T.C. 636, 639 (1985). The *51 court's finding is conclusive in a subsequent suit based on a different cause of action involving the same party, or a person in privity with a party, to the prior litigation. See United States v. Mendoza, supra;Parklane Hosiery Co. v. Shore,439 U.S. 322 (1979). The judicial application of collateral estoppel has often been unclear. This is due, in part, since "The doctrine of collateral estoppel is an adjunct of, and in some instances is loosely referred to as, res judicata." Fairmont Aluminum Co. v. Commissioner,22 T.C. 1377, 1381 (1954), affd. 222 F.2d 622 (4th Cir. 1955). However, collateral estoppel is not applied with the same severity as res judicata. See Commissioner v. Sunnen, supra;Segal v. American Telephone & Telegraph Co.,606 F.2d 842 (9th Cir. 1979). The doctrine is "confined to situations where the matter raised in the second suit is identical in all respects with that decided in the first proceeding and where the controlling facts and applicable legal rules remain unchanged. *52 " Commissioner v. Sunnen, supra at 599-600. If the facts adjudicated in an earlier case relating to one tax year are identical to the facts of a subsequent suit dealing with a different tax year, the prior judgment is conclusive on the same legal issues. See Commissioner v. Sunnen, supra.
In Montana v. United States, supra, the Supreme Court indicates that it is appropriate to invoke collateral estoppel to bar the Commissioner from relitigating with the same taxpayer the precise issue on which the Commissioner has already lost for a prior year. A judgment in a former cause of action will act as an estoppel in a subsequent cause of action "only as to those matters in issue or points controverted, upon the determination of which the finding * * * was rendered." Cromwell v. County of Sac, supra at 353. In other words, where a question of fact essential to the judgment is actually litigated and determined in the first tax proceeding, the parties are bound by that determination in a subsequent proceeding even though the cause *53 of action is different. See Commissioner v. Sunnen, supra.
The Supreme Court has recently broadened the scope of the collateral estoppel doctrine. See Allen v. McCurry,449 U.S. 90 (1980). It has done so by abandoning the requirement of mutuality of parties and by approving the offensive use of collateral estoppel by a nonparty to a prior lawsuit. See Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation,402 U.S. 313 (1971); Parkland Hosiery Co. v. Shore, supra.Offensive use of collateral estoppel occurs when a plaintiff seeks to foreclose a defendant from relitigating an issue the defendant has previously litigated unsuccessfully in another action against the same or a different party. See Parklane Hosiery Co. v. Shore, supra.
Petitioners, in the present cases, seek to preclude respondent from litigating some of the issues involved in the Hill case even though petitioners were not parties to the earlier litigation. While such an argument may be valid against a private party, nonmutual offensive collateral estoppel does not apply against the Government in this case. *54 United States v. Mendoza, supra at 162-163. The conduct of Government litigation in the courts of the United States is sufficiently different from the conduct of private civil litigation in those courts so that what might otherwise be economy interests underlying a broad application of collateral estopel are outweighed by the constraints which peculiarly affect the Government. * * * [A] country result might disserve the economy interests in whose name estoppel is advanced by requiring the Government to abandon virtually any exercise of discretion in seeking to review judgments unfavorable to it. The doctrine of res judicata, of course, prevents the Government from relitigating the same cause of action against the parties to a prior decision * * *. [United States v. Mendoza, supra at 162-163.] In addition to the nonmutuality of parties issue, res judicata and collateral estoppel do not apply here since the transactions in Hill involve a different period of time and different tax issues than the present cases. See Montana v. United States, supra. The Court in Hill had no reason to scrutinize the validity of GMSZ's *55 acquisition of the property, nor did respondent have any reason to litigate the issue. While of substantial help in providing background, the Hill decision does not form the basis for application of the doctrine of collateral estoppel to the instance proceedings.
C. Purchase and Sale of the Fox Shopping Center
Petitioners claim deductions arising from the purchase of the Fox Shopping Center in December, 1971, which the GMSZ Partnership purportedly owned during all of 1972 and then sold in March, 1973. Respondent contends that petitioners are not entitled to these deductions because the transactions were shams, lacking in any economic substance or significance beyond the expected tax benefits which petitioners have claimed. Respondent identifies several past cases involving Margolis clients and the use of system entities which the Tax Court and Ninth Circuit have declared sham transactions. [3] Respondent suggests that these past cases be used to infer that the present cases are also tainted. *56 While this Court is aware that Margolis organized and controlled the transactions in those cases as well as the ones in the present cases, we will not allow an inference by association. The validity of the transactions in the present cases will be judged solely from the testimony and evidence presented in the instant cases. On December 15, 1971, petitioners executed a "Partnership Agreement" for the stated purpose of forming a partnership to buy the Fox Shopping Center in Los Angeles. On December 31, 1971, the GMSZ partners entered into an "Agreement for the Sale of Shopping Center", and purchased the shopping center for $ 2 million from ABC. On December 31, 1971, the partners executed a "Negotiable Promissory Note" for $ 2 million payable to ABC on or before January 5, 1973 at a 10 percent annual interest rate. The first 12 months of interest, $ 200,000, was to be paid in advance on or before December 31, 1971. ABC immediately assigned the $ 2 million Promissory Note to World Minerals, N.V., which acknowledged receipt of the $ 200,000 prepaid interest payable by GMSZ under this note. On December 30, 1971, each of the partners executed "Promissory Notes" for $ 50,000 *57 loans, from the Anglo Dutch Capital Co. The proceeds of these loans, totalling $ 200,000, were purportedly used to make the prepaid interest payment to World Minerals. On their tax returns for 1971, each of the partners then claimed a deduction for an interest payment of $ 50,000. On December 19, 1972, the GMSZ partners executed a "Loan Assumption Agreement" with ABC and Anglo Dutch Capital Co., under which the latter assumed the $ 2 million obligation which GMSZ owed to World Minerals. ABC also agreed to lend GMSZ $ 100,000, which GMSZ was to pay over to Anglo Dutch Capital as prepaid interest on or before December 31, 1972. The partners executed a "Non-Negotiable Promissory Note," for $ 100,000, interest-free, payable to ABC. Four months later, on March 31, 1973, the GMSZ Partnership executed an "Agreement for the Sale of Shopping Center," whereby it sold the property to the Loboma Corporation, owned by Simon Lazarus, for $ 2,250,000. Under this agreement, GMSZ was to receive $ 200,000 as a down payment, and the balance was to be paid by Loboma on or before March 31, 1974. The debt was unsecured, and stated interest of 5-3/4 percent was to accrue on the unpaid balance. *58 In April, 1974, the GMSZ Partnership assigned their claim against Loboma Corporation to Anglo Dutch Capital Co., which then immediately assigned the claim to ABC. ABC, on May 31, 1974, instructed Simon Lazarus to capitalize the $ 2,050,000 debt and treat it as "contributed capital from shareholder." It is settled law that the substance of a transaction rather than the form in which it is cast is determinative of tax consequences. Golsen v. Commissioner,54 T.C. 742, 754 (1970), affd. 445 F.2d 985 (10th Cir. 1971), cert. denied 404 U.S. 940 (1971). Recently the term "sham in substance" has been defined as "the expedient of drawing up papers to characterize transactions contrary to objective economic realities and which have no economic significance beyond expected tax benefits." Falsetti v. Commissioner,85 T.C. 332, 247 (1985). Although a taxpayer may structure a transaction so that it satisfies the formal requirements of *59 the Internal Revenue Code, the Commissioner may deny legal effect to a transaction if its sole purpose is to evade taxation. Zmuda v. Commissioner,731 F.2d 1417, 1421 (9th Cir. 1984), affg. 79 T.C. 714 (1982). For Federal income tax purposes, the term "sale" is generally defined as a transfer of property for money or a promise to pay money. Commissioner v. Brown,380 U.S. 563, 570-571 (1965). In deciding whether a particular transaction constitutes a sale, the question of whether the benefits and burdens of ownership have passed from seller to buyer must be answered. It is a question of fact to be ascertained from the intention of the parties as evidenced by the written agreements read in light of the attendant facts and circumstances. Haggard v. Commissioner,24 T.C. 1124, 1129 (1955), affd. 241 F.2d 288 (9th Cir. 1956). It is incumbent, therefore, in the context of a sales transaction, to determine whether the parties have, in fact, done what the form of their arrangement purports to do. Grodt & McKay Realty, Inc. v. Commissioner,77 T.C. 1221, 1237 (1981). *60 In other words, it must be determined whether the petitioners drafted documents to characterize the transaction as a sale with no economic significance other than the expected tax benefits. See Falsetti v. Commissioner, supra.
The factors which have been considered by courts in making a determination as to whether a sale occurs were summarized in Grodt & McKay Realty, Inc. v. Commissioner, supra at 1237-1238, as follows: (1) Whether legal title passes; (2) how the parties treat the transaction; (3) whether an equity was acquired in the property; (4) whether the contract creates a present obligation on the seller to execute and deliver a deed and present obligation on the purchaser to make payments;; (5) whether the right or possession is vested in the purchaser; (6) which party pays the property taxes; (7) which party bears the risk of loss or damage to the property; and (8) which party receives the profits from the operation and sale of the property * * *. [Citations omitted.] An additional factor is the presence or absence of arm's-length dealing. *61 Falsetti v. Commissioner, supra at 354. Petitioners point to the documents generated by the Margolis law firm to characterize those transactions, and insist that the Court accept and believe that the form of the transaction is synonymous with its substance. However, the documentary evidence is a study in confusion. Petitioners have provided no explanation for the convoluted structure of the transactions. Other than tax benefits, it is not clear as to the purpose served by ABC's immediately assigning the $ 2 million note to World Minerals or the underlying reason for the assumption one year later by Anglo Dutch Capital Co. of the $ 2 million note. By this assumption, GMSZ was once again obligated to make a prepayment of interest, in the amount of $ 100,000. Moreover, World Minerals, N.V. was not even a party to that agreement. Also, under the assumption agreement, ABC was to make an interest free loan to GMSZ of $ 100,000 and ABC was to agree to pay Anglo Dutch Capital Co. five percent of the principal amount owed on the note for a period of five years. If the form of this transaction is to be believed,then not only did ABC never receive any money for *62 its sale of the shopping center, but ABC was also the only party to the transaction who was ever obligated to make payments of principal. With respect to whether GMSZ ever acquired an equity interest in the property, no payments of principal were called for under the contracts. Given the structure of the transactions, and the almost immediate resale to Loboma, it is difficult to see how they could have acquired an equity interest. The manner in which ownership was transferred in 1973 to the Loboma Corporation is a further consideration as to whether there was a bona fide sale by ABC to GMSZ. A convoluted series of transactions are recited by the documents in connection with this transfer. Petitioners have done nothing to provide any explanation for these transactions. First, Loboma purchased the property from GMSZ on March 31, 1973, with a $ 200,000 down payment, and the balance of the $ 2,250,000 total purchase price payable to GMSZ on or before March 31, 1974. Next, GMSZ assigned the debt owed to it by Loboma to the Anglo Dutch Capital Co., which immediately turned around and assigned the debt to ABC. Finally, ABC instructed Simon Lazarus, president of Loboma that he *63 may capitalize the $ 2,050,000 debt "as contributed capital from shareholder." Petitioners produced voluminous records, which the Margolis law firm generated, to prove that the transactions were bona fide. They were stipulated into evidence with the reservation that the Court would decide their significance. There has not been any substantiation of those documents, yet petitioners insist that the form of the transaction is synonymous with its substance.
The burden of proof requires petitioners to show the merits of their claim by a preponderance of the evidence. See Rockwell v. Commissioner, supra;Brumley-Donaldson Co. v. Commissioner,443 F.2d 501, 504 n.4 (9th Cir. 1971). That burden is not satisfied by the offer of documents without further substantiating testimony. See Rockwell v. Commissioner, supra.
Petitioners offered no evidence that the GMSZ Partnership was ever independently represented in any of its transactions, nor evidence that there were any negotiations whatsoever of terms or price as between the partnership and *64 ABC, World Minerals, or Anglo Dutch Capital Co. Further, there was no evidence that the partnership obtained independent appraisals of the value of the shopping center either at the time they purchased it or at the time they sold it. The testimony reveals that there was no distance between the partnership and the transactions arranged for it by the Margolis office. The petitioners have failed to provide persuasive evidence which would lend substance to their alleged purchase and resale of the shopping center and demonstrate that respondent's conclusion, that the transactions lacked economic purpose, was erroneous. Indeed, they have utterly failed to even address or offer explanations for many of the convoluted transactions reflected in their documents. Robert Kahan, a Certified Public Accountant, prepared most of the petitioners' tax returns for the years at issue. He rendered accounting services to petitioners during the years at issue, but did not know whether he saw documents pertaining to transactions of the GMSZ Partnership at or about the dates they bear. He testified neither as a percipient witness nor an expert witness, but as the person who prepared the petitioners' *65 tax returns. Most of his testimony was either wholly speculative or hearsay, since his only knowledge of the transactions was what he had been told for purposes of preparing petitioners' tax returns. Similarly, beyond identifying their signatures on the key transactional documents, the testimony of Dr. Gurdin and Dr. Zeiler provided little to establish the substance of the transactions. With these factors in mind and cognizant that the totality of the facts and circumstances surrounding the transaction is controlling, it is the judgment of this Court that petitioners failed to prove that the sale of the Fox Shopping Center took place and that the Partnership acquired an interest in the property. It is clear that the present transaction was entered without any economic purpose other than expected tax benefits and, in fact, documents were drafted to characterize the transaction as a sale in anticipation of receiving the favorable tax consequences flowing from that form.
D. Interest Deduction
Petitioners assert that they are entitled to deduct the interest paid on loans under section 163(a). Respondent counters that petitioners are not entitled to such deductions because *66 no real indebtedness existed.
Section 163(a) provides for the deduction of "all interest paid or accrued within the taxable year on indebtedness." "Interest" means compensation paid for the use of borrowed money. Old Colony R. Co. v. Commissioner,284 U.S. 552, 560 (1932). "Indebtedness" has been defined as "an unconditional and legally enforceable obligation for the payment of money." Autenreith v. Commissioner,115 F.2d 856, 858 (3rd Cir. 1940), affg. 41 B.T.A. 319 (1940); Knetsch v. United States,364 U.S. 361 (1960). Petitioners have the burden of proving that the interest they paid on the loans was actually interest on indebtedness rather than a subterfuge to create additional tax deductions. See Welch v. Helvering, supra;Llorente v. Commissioner, supra;Rule 142(a). It is clear from the facts that the loans were handled and controlled by Margolis. All lending entities were system entities controlled by Margolis. All payments on these loans were made to system entities. *67 Loan after loan was rolled over into another system entity. The $ 2 million loan GMSZ obtained from ABC to purchase the shopping center, upon which they base their claim for interest payments in 1971 and 1972, was circulated from ABC to World Minerals, N.V., then from World Minerals, N.V. to Anglo Dutch Capital Co., and finally disappeared into the Loboma Corporation in 1973. Here there was a circular transfer of loans, and no money was being lent in a substantive sense and thus the loans do not reflect genuine indebtedness. See Karme v. Commissioner, supra. It is incumbent on petitioners to produce evidence to the contrary if any such evidence exists. See Karme v. Commissioner, supra.
It is apparent that petitioners never used their own money to pay off these debts and that the amounts paid on the debt are not deductible. Petitioners have failed to carry their burden to prove otherwise since no evidence was produced to rebut the inference that the $ 2 million loan for purchase of the shopping center was anything other than a meaningless link in the overall sham transaction.
E. Sears Lease
On March 28, 1973, Meyer Zeiler executed an agreement with California *68 Care Corporation (CCC) to purchase a 2 1/2 percent annual override provided for in a lease CCC had with Sears Roebuck & Co. The price Dr. Zeiler agreed to pay for this leasehold interest was a total of $ 2,200,000 in principal, payable over the 14-year term of the agreement, plus interest in the amount of $ 1,500,000 payable at $ 15,000 per month. Dr. Zeiler also agreed to pay $ 40,000 in taxes each year. CCC assigned its right to the interest payments from Dr. Zeiler to Antiqua Banking Limited on October 1, 1973. Dr. Zeiler transferred his interest in the Sears leasehold to the GMSZ Partnership as a contribution to capital on March 4, 1974. CCC then purchased the GMSZ Partnership interests of Sievers and Zeiler in 1976 and the GMSZ Partnership interests of Gurdin and Marcus in 1978. Petitioner has the burden of proof and the burden of going forward with the evidence to show that the interest in the Sears lease is bona fide. Rule 142(a); Welch v. Helvering, supra;Greenberg's Express, Inc. v. Commissioner, supra;Llorente v. Commissioner, supra.
Petitioners have offered the Court no evidence to establish that the Sears *69 lease transactions were conducted at arm's length, or to otherwise establish independent indicia that the transactions were bona fide or had economic substance. The documents in evidence pertaining to income from the Sears leasehold and to purported interest payments by GMSZ for the leasehold, reflect that such payments were handled and controlled within the Margolis system. Based upon all of the considerations, it is found that the Sears leasehold transactions were a sham.
F. Additions to Tax
Finally, respondent contends that these cases warrant the application of the negligence addition because petitioners failed to adduce any evidence at all of the issues and because the tax avoidance schemes in these cases were egregious.
Section 6653(a) provides for a 5-percent negligence addition whenever "any part of an underpayment" is due to "negligence or intentional disregard of rules or regulations." Negligence is determined by the reasonable, prudent person standard. Zmuda v. Commissioner, supra at 1422. Respondent's determination that petitioners are negligent *70 is prima facie correct and casts the burden upon petitioner to produce evidence that the imposition of the addition to tax is erroneous. See Pritchett v. Commissioner,63 T.C. 149 (1974); Enoch v. Commissioner,57 T.C. 781 (1972). Petitioners contend that they attempted to legally minimize their taxes and that they relied in good faith on expert tax planning advice. Further, they claim that there are no facts to show that they had notice of their erroneous legal position.
While reliance on expert advice in a defense to the negligence addition to tax, the general rule is that the duty of filing accurate returns cannot be avoided by placing responsibility on an agent. See United States v. Boyle,460 U.S. 241 (1985); Betson v. Commissioner,802 F.2d 365 (9th Cir. 1986); Pritchett v. Commissioner, supra at 174. Petitioners must bear the ultimate responsibility for any negligent errors of their agent. American Properties, Inc. v. Commissioner,28 T.C. 1100 (1957) affd. 262 F.2d 150 (9th Cir. 1958). *71 Where petitioners' tax positions are "reasonably debatable" and there is good faith reliance on professional advice concerning tax laws, the Ninth Circuit has held that the negligence addition does not apply. See Betson v. Commissioner, supra. In Betson, the taxpayer was not negligent because there was good faith reliance on the substantive advice of his accountant and no facts were disclosed to charge the taxpayer with notice of the erroneous legal position asserted in his return. A deviation from the general rule is not warranted in this case. Petitioners were sophisticated investors who knew, or should have known, that they were engaging in a tax avoidance scheme. Petitioners knew, or should have known, that the debt they created would never be paid. They should have known that the debts they were creating did not give rise to valid tax deductions. In addition, petitioners failed to introduce any evidence to refute the Commissioner's determination or show any good faith reliance on their agent. Under these circumstances, the petitioners are not permitted *72 to hide behind the defense that they relied upon the advice of counsel. Respondent did not err in determining that the underpayment was due to negligence or intentional disregard of rules and regulations within the meaning of section 6653(a). It is difficult to believe that petitioners viewed the transactions as anything other than a tax avoidance scheme. In each docket number an appropriate order will be issued restoring it to the general docket for trial of the remaining issues.
Footnotes
1. The following cases are consolidated herewith: Jerome J. Sievers and Marjorie Sievers, docket Nos. 5661-74; 7203-75; 7229-77, and 14472-80; and Meyer Zeiler and Floria Zeiler, docket Nos. 5662-74; 7199-75, 11463-77 and 15477-80. ↩
2. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise provided. ↩
3. See, e.g., Karme v. Commissioner,73 T.C. 1163 (1980), affd. 673 F.2d 1062 (9th Cir. 1982); Thompson v. Commissioner,631 F.2d 642 (9th Cir. 1980), affg. 66 T.C. 1024 (1976); Leonard v. Commissioner,T.C. Memo 1986-328; Bail Bonds v. Commissioner,T.C. Memo. 1986-23, affd. 820 F.2d 1543 (9th Cir. 1987); Gurdin v. Commissioner,T.C. Memo 1987-69↩.